**MEXICAN INTERMODAL EQUIPMENT, S.A. DE C.V., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 01–713C.**

United States Court of Federal Claims.

June 10, 2004.

Edward H. Kim, Whitford, Taylor & Preston, L.L.P., Washington, D.C., for the plaintiff. Sonja Mishalanie, Whiteford, Taylor & Preston, L.L.P., Washington, D.C., of counsel.

Kent G. Huntington, Trial Attorney; Franklin E. White, Jr., Assistant Director; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, for the defendant. John Litman, United States Marine Corps Logistics Base, Albany, GA, of counsel.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

On June 30, 1995, the United States Marine Corps (USMC) issued a request for proposals (RFP) for 400 dry-cargo freight containers and the option to purchase 400 additional containers, to be manufactured according to specifications and delivered to the USMC's base on Blount Island, Florida. On August 11, 1995, Mexican Intermodal Equipment (MIE), a container manufacturer located in Nueva Leon, Mexico, submitted its proposal in response to the RFP. On August 22, 1995, the USMC invited MIE to submit its best and final offer (BAFO) in response to the solicitation.

On September 5, 1995, MIE submitted its BAFO to the USMC, including a proposed price of $3,995.00 per unit for the first 400 containers and the same price per unit for the second 400 option containers. The USMC determined that MIE's BAFO was the lowest, technically acceptable offer submitted. Subsequently, the USMC requested a pre-award responsibility survey from Defense Contract Management Area Operations, San Antonio (DCMAO), to determine whether MIE was financially and otherwise capable of performing the contract. The DCMAO's survey was negative for MIE and contained a recommendation that the USMC not award MIE the contract.

On October 2, 1995, the USMC awarded the contract to Container Coatings International (CCI), at a price of $4,550.00 per container, and notified MIE of the award on the same date. The letter to MIE also indicated that plaintiff had not been awarded the contract because DCMAO had determined that MIE "failed to pass the Pre–Award Survey in the areas of technical and production." The parties agree that, subsequent to the contract award to CCI, but prior to cancellation of the award and resolicitation, the USMC released CCI's contract award price and all the offerors' BAFOs (contained in the abstract of bids prepared by the USMC) pursuant to requests for information under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (2000).

MIE and two other bidders, including T.R.S. Research (TRS), filed post-award bid protests with the General Accounting Office (GAO). See Trans Tac Management Corp.; T.R.S. Research; Mexican Intermodal Equipment, S.A. de C.V., Comp. Gen. Dec. B–270074 (Oct. 31, 1995) (unpub). MIE's protest, filed on October 10, 1995, alleged that MIE's bid was improperly rejected as nonresponsible without referring the matter of its nonresponsibility to the Small Business Administration (SBA) for consideration under Certificate of Competency (CoC) procedures. Id.

On October 23, 1995, Thomas Deacher, the contracting officer for the USMC, decided that, in recognition of the bid protests, the contract between the USMC and CCI would be terminated for the convenience of the government. In his October 23, 1995 memorandum for the record, the contracting officer concluded that meaningful discussions had not been conducted between TRS and the USMC, and that there was a likelihood that the bid protest by TRS would be upheld by the GAO. Because the USMC still had a need for dry-cargo containers and funds were still available to obtain them, Mr. Deacher recommended that the container contract be resolicited after termination of the award to CCI. Six days later, in response to the USMC's termination of the contract,

the GAO dismissed all three bid protests concerning the contract award.[1] *See Trans-Tac Management Corp.; T.R.S. Research; Mexican Intermodal Equipment, S.A. de C.V.*, Comp. Gen. Dec. B–270074 (Oct. 31, 1995) (unpub).

On December 7, 1995, the USMC sent MIE written notification that the USMC had terminated its contract with CCI for the convenience of the government. This notification also stated that a contract for the required containers would be resolicited among companies which had submitted bids in the competitive range for the first RFP, with an update in clauses and the addition of two new clauses.

The resolicitation for dry-cargo containers was issued on December 7, 1995. Two new clauses, contained in the superceding solicitation, were numbered L–19 and M–2. Clause L–19, "Summary of Proposal Submission," required bidders to submit a "Summary of Proposal Submission" with each bid proposal. The summary was required to include two complete sets of blueprint design drawings, an identification of all materials to be used in the container construction, Material Safety Data Sheets for all protective coating materials, identification of wood flooring specifications and insect infestation treatment methods, and paint warranties. Clause M–2, "Proposal Evaluation Criteria," provided additional guidelines under which the government would select the successful contractor in the bidding process. For example, clause M–2 notified bidders that the USMC might reject any or all offers which are not in the public interest, accept other than the lowest offer, and waive minor irregularities in offers received. Clause M–2 also provided that award could be made without discussions.

On February 7, 1996, the USMC notified MIE by mail that the company's proposal for the resolicitation was in the competitive range. That letter also requested clarifications, including on certain technical issues in MIE's proposal. On February 26, 1996, MIE was sent a letter requesting that MIE submit a price BAFO on the resolicitation.

On March 7, 1996, MIE submitted a BAFO including a proposed price of $3,438.00 per unit.

The USMC determined that MIE's BAFO was the lowest-priced, technically acceptable offer to the resolicitation. Once again, the USMC requested a pre-award responsibility survey from the DCMAO. This pre-award survey reflected that MIE was responsible, and the DCMAO recommended that the superceding contract for dry-cargo containers be awarded to MIE.

On April 19, 1996, the USMC awarded the superceding contract to MIE for $3,438.00 per unit for the first 400 units (plus $1.00 per unit for first approval testing) and $3,438.00 per unit for the optional second 400 containers. The parties subsequently agreed that the initial container order would be increased to 591 units, which were to be delivered to Blount Island between June 1, 1996, and December 5, 1996. On June 25, 1996, the USMC exercised its option to purchase the remaining 209 containers, also at the price of $3,438.00.

By February 13, 1997, no acceptable dry-cargo containers had been delivered to Blount Island and the parties modified the contract between MIE and the USMC, delaying the delivery dates from March 10, 1997 to October 30, 1997. In consideration for this extension, MIE agreed to provide the USMC with thirty additional dry-storage containers, at no cost to the USMC. Subsequently, the delivery schedule was revised three more times, until the dates were finally set for delivery between January 30, 1998 and July 18, 1998. In consideration of each delivery date extension, MIE agreed to give the USMC ten additional dry-cargo containers, at no additional charge. On October 1, 1998, after MIE had delivered 860 containers, the USMC made its final payment to MIE on the contract.

Two years later, on October 11, 2000, MIE submitted a certified claim to the USMC contracting officer pursuant to the Contract Disputes Act, 41 U.S.C. § 605(a) (2000).

---

1. MIE requested reconsideration by the GAO of the dismissal of its protest. MIE withdrew its request for reconsideration on February 7, 1996.

This claim to the agency alleged that the USMC had improperly reopened discussions after disclosing sensitive price information in the process of making its initial award, in violation of Federal Acquisitions Regulation (FAR) 15.611(c) (1995), and had engaged in illegal auction techniques, in violation of FAR 15.610(e) (1995). The claim was submitted two years after completion of performance on the superceding contract and four-and-one-half years after MIE submitted its BAFO for the resolicitation. In an affidavit submitted to the court, the President of MIE indicated that the timing of MIE's filing of its claim to the contracting officer was dictated by the financial means of the company, which were strained, in part, after substantial expenditures of funds to pursue the bid protest and motion for reconsideration with the GAO, leaving the company in a "precarious position." MIE's claim was denied by the USMC on December 21, 2000.

The contracting officer who cancelled and resolicited the procurement, Thomas Deacher, retired on August 31, 1998, after award to MIE, and died on December 15, 1998. Mr. Deacher's successor, Helen Daughtry, retired on January 3, 2001, and her whereabouts are unknown.

MIE's complaint states that the company was compelled to reduce its offering price substantially from its first-round BAFO because of improper reopening of discussions on the container contract by the USMC following the resolicitation, in violation of FAR 15.611(c). MIE also alleges that the USMC's resolicitation of bids on the dry-cargo container contract, after revealing information about BAFOs from the first round of solicitations, was an illegal use of auction techniques by the USMC, in violation of FAR 15.610(e). The defendant argues that the USMC did not violate the FAR because the USMC acted within legal guidelines when it released the original bid prices pursuant to the FOIA and did not abuse its authority or act arbitrarily in deciding to resolicit or regarding how it conducted the resolicitation. The case was originally assigned to the Honorable Lynn J. Bush, and was transferred to the undersigned judge in September, 2003.

## DISCUSSION

This case comes before the court on appeal from a final decision by the USMC's contracting officer. The government originally moved to dismiss the complaint for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC), and also alleged that plaintiff failed to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(6). Alternatively, the defendant moved for summary judgment, pursuant to RCFC 56.

*Motion to Dismiss Jurisdiction*

Subject matter jurisdiction may be challenged at any time by the parties, by the court *sua sponte*, even on appeal. *Fanning, Phillips, Molnar v. West*, 160 F.3d 717, 720 (Fed.Cir.1998) (quoting *Booth v. United States*, 990 F.2d 617, 620 (Fed.Cir.), *reh'g denied* (1993)); *United States v. Newport News Shipbuilding & Dry Dock Co.*, 933 F.2d 996, 998 n. 1 (Fed.Cir.1991). Once jurisdiction is challenged by the court or the opposing party, the plaintiff bears the burden of establishing jurisdiction. *See McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed.Cir.1998); *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1324 (Fed.Cir.1997); *Rocovich v. United States*, 933 F.2d 991, 993 (Fed.Cir.1991); *Bowen v. United States*, 49 Fed.Cl. 673, 675 (2001) (noting that the plaintiff bears the burden of proof on a motion to dismiss for lack of jurisdiction), *aff'd*, 292 F.3d 1383 (Fed.Cir.2002); *Schweiger Constr. Co., Inc. v. United States*, 49 Fed.Cl. 188, 205 (2001); *Catellus Dev. Corp. v. United States*, 31 Fed. Cl. 399, 404 (1994). A plaintiff must establish jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988); *Thomas v. United States*, 56 Fed.Cl. 112, 115 (2003); *Martinez v. United States*, 48 Fed.Cl. 851, 857 (2001), *aff'd in part*, 281 F.3d 1376 (Fed.Cir.), *reh'g denied* (2002); *Bowen v. United States*, 49 Fed.Cl. at 675; *Vanalco, Inc. v. United States*, 48 Fed.Cl. 68, 73 (2000); *Alaska v. United States*, 32 Fed.Cl. 689, 695 (1995), *appeal dismissed*, 86 F.3d

1178 (Fed.Cir.1996) (table). When construing the pleadings pursuant to a motion to dismiss, the court should grant the motion only if "it appears beyond doubt that [plaintiff] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (quoting *Conley v. Gibson,* 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Brubaker Amusement Co., Inc. v. United States,* 304 F.3d 1349, 1355 (Fed.Cir.2002), *cert. denied sub nom. Penn Triple S v. United States,* 538 U.S. 921, 123 S.Ct. 1570, 155 L.Ed.2d 311 (2003); *Leider v. United States,* 301 F.3d 1290, 1295 (Fed.Cir.2002), *cert. denied,* 538 U.S. 978, 123 S.Ct. 1786, 155 L.Ed.2d 666 (2003); *Conti v. United States,* 291 F.3d 1334, 1338 (Fed.Cir.2002), *cert. denied,* 537 U.S. 1112, 123 S.Ct. 904, 154 L.Ed.2d 785 (2003); *Consolidated Edison Co. v. O'Leary,* 117 F.3d 538, 542 (Fed.Cir.1997), *cert. denied sub nom. Consolidated Edison Co. v. Pena,* 522 U.S. 1108, 118 S.Ct. 1036, 140 L.Ed.2d 103 (1998); *see also New Valley Corp. v. United States,* 119 F.3d 1576, 1579 (Fed.Cir.), *reh'g denied, en banc suggestion declined* (1997); *Highland Falls–Fort Montgomery Cent. Sch. Dist. v. United States,* 48 F.3d 1166, 1169 (Fed.Cir.), *cert. denied,* 516 U.S. 820, 116 S.Ct. 80, 133 L.Ed.2d 38 (1995); *Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989), *cert. denied,* 517 U.S. 1155, 116 S.Ct. 1542, 134 L.Ed.2d 646 (1996); *W.R. Cooper Gen. Contractor, Inc. v. United States,* 843 F.2d 1362, 1364 (Fed.Cir.1988) ("When the facts alleged in the complaint reveal 'any possible basis on which the non-movant might prevail, the motion must be denied.'"); *RCS Enters., Inc. v. United States,* 46 Fed.Cl. 509, 513 (2000).

Pursuant to Rule 8(a)(1) of the RCFC and Rule 8(a)(1) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the grounds upon which the court's jurisdiction depends." RCFC 8(a)(1). However, "[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States,* 124 F.3d 1462, 1465 (Fed.Cir.), *reh'g denied* (1997) (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)). "[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), *cert. denied sub nom. Talley v. Crosson,* 460 U.S. 1037, 103 S.Ct. 1426, 75 L.Ed.2d 787 (1983); *see also Bradley v. Chiron Corp.,* 136 F.3d 1317, 1322 (Fed.Cir.1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

When deciding a motion to dismiss based on lack of subject matter jurisdiction, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Conley v. Gibson,* 355 U.S. at 45–46, 78 S.Ct. 99; *Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1343 (Fed.Cir.2002), *cert. denied,* 538 U.S. 906, 123 S.Ct. 1484, 155 L.Ed.2d 226 (2003); *Pixton v. B & B Plastics, Inc.,* 291 F.3d 1324, 1326 (Fed.Cir.2002); *Commonwealth Edison Co. v. United States,* 271 F.3d 1327, 1338 (Fed.Cir.2001) (quoting *New Valley Corp. v. United States,* 119 F.3d at 1580), *cert. denied,* 535 U.S. 1096, 122 S.Ct. 2293, 152 L.Ed.2d 1051 (2002); *Boyle v. United States,* 200 F.3d 1369, 1372 (Fed.Cir. 2000); *Perez v. United States,* 156 F.3d 1366, 1370 (Fed.Cir.1998); *Highland Falls–Fort Montgomery Cent. Sch. Dist. v. United States,* 48 F.3d at 1167 (citing *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir. 1991)); *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995); *Hamlet v. United States,* 873 F.2d at 1416; *Ho v. United States,* 49 Fed.Cl. 96, 100 (2001), *aff'd,* 30 Fed.Appx. 964 (Fed.Cir.2002); *Alaska v. United States,* 32 Fed.Cl. at 695. If a defendant or the court challenges jurisdiction or the plaintiff's claim for relief, however, the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. *McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. at 189, 56 S.Ct. 780; *see also Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009,

91 L.Ed. 1209 (1947); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d at 747; *Catellus Dev. Corp. v. United States*, 31 Fed.Cl. at 404–05. When considering a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to resolve any factual disputes. *See Moyer v. United States*, 190 F.3d 1314, 1318 (Fed.Cir.1999); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d at 747; *see also Cedars–Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed.Cir.1993) ("In establishing predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony."), *cert. denied*, 512 U.S. 1235, 114 S.Ct. 2738, 129 L.Ed.2d 859 (1994); *Vanalco v. United States*, 48 Fed.Cl. at 73 ("If the truth of the alleged jurisdictional facts is challenged in a motion to dismiss, the court may consider relevant evidence to resolve the factual dispute."). It is appropriate to grant a motion to dismiss under RCFC 12(b)(6) only if it appears "beyond doubt that [the plaintiff] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. at 654, 119 S.Ct. 1661; *Perez v. United States*, 156 F.3d at 1370; *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 656 (2003).

In order for this court to have jurisdiction over a plaintiff's complaint, the Tucker Act requires that the plaintiff identify an independent substantive right enforceable against the United States for money damages. 28 U.S.C. § 1491 (1994). The Tucker Act states:

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, this Act waives sovereign immunity to allow jurisdiction over claims (1) founded on an express or implied contract with the United States; (2) for a refund from a prior payment made to the government; or (3) based on federal constitutional, or statutory, or regulatory law mandating compensation by the federal government for damages sustained. *See United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), *reh'g denied*, 425 U.S. 957, 96 S.Ct. 1736, 48 L.Ed.2d 202 (1976) (citing *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 605–06, 372 F.2d 1002, 1009 (1967)); *see also Palmer v. United States*, 168 F.3d 1310, 1314 (Fed.Cir.1999); *Stinson, Lyons & Bustamante, P.A. v. United States*, 33 Fed.Cl. 474, 478 (1995), *aff'd*, 79 F.3d 136 (Fed.Cir.1996). A waiver of traditional sovereign immunity cannot be implied but must be "unequivocally expressed." *INS v. St. Cyr*, 533 U.S. 289, 299 n. 10, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001); *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *Ins. Co. of the West v. United States*, 243 F.3d 1367, 1372 (Fed.Cir.), *reh'g and reh'g en banc denied* (2001); *Saraco v. United States*, 61 F.3d 863, 864 (Fed.Cir.1995) (quoting *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)), *cert. denied*, 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996).

The Tucker Act, however, merely confers jurisdiction on the United States Court of Federal Claims, " 'it does not create any substantive right enforceable against the United States for money damages.' " *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (quoting *United States v. Testan*, 424 U.S. at 398–99, 96 S.Ct. 948), *reh'g denied*, 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980); *White Mountain Apache Tribe v. United States*, 249 F.3d 1364, 1372 (Fed.Cir.), *reh'g and reh'g en banc denied* (2001), *aff'd*, 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003); *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed.Cir.2000); *cert. denied*, 532 U.S. 1065, 121 S.Ct. 2214, 150 L.Ed.2d 208 (2001); *New York Life Ins. Co. v. United States*, 118 F.3d 1553, 1555–56 (Fed.Cir.1997), *cert. denied*, 523 U.S. 1094, 118 S.Ct. 1559, 140 L.Ed.2d 792 (1998); *United States v. Connolly*, 716 F.2d 882, 885 (Fed.Cir.1983) (en banc), *cert. denied*, 465 U.S. 1065, 104 S.Ct.

1414, 79 L.Ed.2d 740 (1984). Individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Mitchell*, 445 U.S. at 538, 100 S.Ct. 1349. In order for a claim to be successful, the plaintiff "must also demonstrate that the source of law relied upon 'can fairly be interpreted as mandating compensation by the federal government for the damages sustained.'" *White Mountain Apache Tribe v. United States*, 249 F.3d at 1372 (quoting *United States v. Mitchell*, 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)); *United States v. Testan*, 424 U.S. at 400, 96 S.Ct. 948; *Tippett v. United States*, 185 F.3d 1250, 1254 (Fed.Cir.1999) ("[T]he plaintiff must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States.") (quoting *James v. Caldera*, 159 F.3d 573, 580 (Fed.Cir.1998), *reh'g denied* (1999)); *Doe v. United States*, 100 F.3d 1576, 1579 (Fed.Cir. 1996), *reh'g denied and en banc suggestion declined* (1997); *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. at 607, 372 F.2d at 1009.

*Claims by a Foreign Plaintiff*

■ The jurisdiction of this court over claims brought by a foreign plaintiff, such as MIE, is governed by the reciprocity provision in 28 U.S.C. § 2502 (2000). The statute gives the Court of Federal Claims jurisdiction to hear complaints brought by "[c]itizens or subjects of any foreign government which accords to citizens of the United States the right to prosecute claims against their government in its courts," so long as the subject matter of the suit is otherwise within the jurisdiction of the Court of Federal Claims. 28 U.S.C. § 2502(a).

MIE, as the plaintiff in this action, bears the burden of affirmatively demonstrating reciprocal rights to sue the alien sovereign in its courts. *See Humphries v. United States*, 44 Fed.Cl. 81, 82 (1999); *see also Ferreiro v. United States*, 350 F.3d 1318, 1322 (Fed.Cir. 2003) (discussing the reciprocity requirement), *reh'g and reh'g en banc denied* (2004). To fulfill the reciprocity requirement in this case, MIE must show that American citizens may bring claims against the government of Mexico in the Mexican court system and enjoy standing to pursue those claims equal to that of Mexican citizens. *See Pottawatomi Nation in Canada v. United States*, 27 Fed.Cl. 388, 392 (1992). The test for jurisdiction under section 2502(a) is whether "the doors of [Mexican] courts are open to American citizens for the prosecution of 'claims' against the [Mexican Government], but necessarily only such claims as might be prosecuted by [Mexican citizens]...." *Brodie v. United States*, 62 Ct.Cl. 29, 46, 1926 WL 2598 (1926); *see also Nippon Hodo Co. v. United States*, 152 Ct.Cl. 190, 193, 285 F.2d 766, 767–68 (1961). The plaintiff also must show that the equal ability of American citizens to pursue claims in Mexican courts exists in practice, as well as in law. *Id.* at 768. Although judging whether the courts of the plaintiff's country of citizenship are truly open to suits against the sovereign by American citizens can be difficult, *see Ferreiro v. United States*, 350 F.3d at 1322, a plaintiff such as MIE can meet the standards of the reciprocity requirement by presenting, for example, "any statutes or caselaw on the subject; an affidavit or deposition from an experienced [Mexican] attorney or relevant government official," demonstrating that American citizens have equal standing to sue in the Mexican court system. *Humphries v. United States*, 44 Fed.Cl. at 82.

In support of the plaintiff's argument that this court has jurisdiction to hear its claims, MIE provided the court with translations of Articles 71–73 of Mexico's Law of Acquisitions, Leases and Services for the Public Sector, which establishes a system for resolution of disputed contracts, but does not address the status of foreign nationals. The plaintiff also provided the court with the affidavit of Lic. Eric Navarro Espinosa, an attorney licensed to practice law in Mexico, as evidence that American citizens have equal access to Mexico's court system for the purpose of suing the Mexican government. *See id.* Navarro Espinosa states in his affidavit that "[t]he Mexican laws on government procurement would apply equally to a contractor or supplier from the United States." The affiant's use, in his testimony, of the conditional "would" might still leave some question as to whether Americans pur-

suing claims in the Mexican court system are, in fact, treated equally with Mexican claimants. Moreover, Lic. Espinosa's statement notes that Mexican laws would "apply" to American contractors, for example, those doing business in Mexico, but does not state that American contractors can sue in Mexico.

The most conclusive evidence of the reciprocal ability of Americans to sue the Government of Mexico in Mexican courts was provided by the defendant, which initially challenged the court's jurisdiction to hear this foreign plaintiff's case. At the direction of the court, the defendant was asked to obtain a position statement from the United States Department of State, regarding the ability of Americans to sue the Mexican government in the Mexican court system. The United States Department of State's investigation included gathering information from local attorneys in Mexico City who represent American clients, as well as from a trade association of American owners of factories in Mexico. The United States Department of State Report cited numerous cases of American companies successfully suing Mexican government agencies in Mexican courts. In the Report submitted to the court by defendant, the Department of State concluded that, "U.S. contractors do have reciprocal rights in law and in the ordinary course of practice that are equal to those of Mexican citizens to fully prosecute their contract claims against the Government of Mexico."

In light of the Mexican statute and the affidavit submitted by the plaintiff, and particularly based on the United States Department of State Report submitted by the defendant in response to the court's inquiry, the court concludes that American plaintiffs have an ability to sue the Mexican government in Mexican courts which is equal in law and practice to that of Mexican citizens. The reciprocity requirement is satisfied, and this court has jurisdiction to hear plaintiff's case in conformance with the requirements of 28 U.S.C. § 2502(a). Defendant's motion to dismiss, based on the absence of reciprocity, is denied.

## Summary Judgment

In addition to its motion to dismiss, defendant moved for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Monon Corp. v. Stoughton Trailers. Inc.*, 239 F.3d 1253, 1257 (Fed.Cir.2001); *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir.1996), *reh'g denied* (1997); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed. Cir.1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d at 1257; *Curtis v. United States*, 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied*, 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. United States*, 49 Fed.Cl. 648, 651 (2001), *aff'd*, 317 F.3d 1331 (Fed.Cir.2003); *Becho, Inc. v. United States*, 47 Fed.Cl. 595, 599 (2000).

The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.,* 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States,* 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex. Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds,* 970 F.2d 890 (Fed.Cir.1992); *United States Steel Corp. v. Vasco Metals Corp.,* 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (C.C.P.A.1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *Eli Lilly & Co. v. Barr Labs., Inc.,* 251 F.3d 955, 971 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.,* 179 F.3d 1350, 1353 (Fed.Cir. 1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. at 587–88, 106 S.Ct. 1348; *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 741 (Fed.Cir.1997) (quoting *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (1995)), *reh'g denied and en banc suggestion declined* (1997); *Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines v. United States,* 204 F.3d 1103, 1108 (Fed. Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.,* 247 F.3d 1202, 1207 (Fed.Cir. 2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.* On the interrelated issues of the

propriety of the resolicitation for cargo containers, and whether the USMC engaged in unlawful auction techniques, the court finds that there are no material facts in dispute to preclude resolution.

*Resolicitation and Auction Techniques*

In its complaint, plaintiff contends that "[t]he USMC improperly reopened discussions and asked for a second round of BA-FOs without adequate justification and in violation of FAR 15.611(c)," and that "[t]he USMC engaged in improper auction techniques in violation of FAR 15.610(e)." As a result of these alleged violations of FAR provisions by the USMC, plaintiff claims damages in the amount of $460,620.00.

FAR 15.611(c) provides that:

After receipt of best and final offers, the contracting officer should not reopen discussions unless it is clearly in the Government's interest to do so (e.g., it is clear that information available at that time is inadequate to reasonably justify contractor selection and award based on the best and final offers received). If discussions are reopened, the contracting officer shall issue an additional request for best and final offers to all offerors still within the competitive range.

FAR 15.610(e) provides that "[a]uction techniques, such as ... furnishing information about other offerors' prices" may constitute prohibited conduct. The resolicitation (described by plaintiff as a vehicle for reopening discussions) of cargo containers and the concept of auction techniques are intertwined in the plaintiff's argument. The plaintiff contends that: "By re-soliciting the same Contract, USMC improperly reopened negotiations and requested a second round of BAFOs thereby creating an illegal auctioning effect in violation of FAR 15.610(e).... Thus, to determine whether an illegal auction occurred, the Plaintiff must show that the government reopened negotiations and accepted new BAFOs without a rational or reasonable basis for doing so."

Defendant responds that the plaintiff's challenge to the resolicitation was waived when MIE "withdrew its bid protest, re-bid on the contract, accepted the contract, and

then performed," citing *Aerolease Long Beach v. United States*, 31 Fed.Cl. 342, 358 (1994) ("If an offeror recognizes an ambiguity or other problem in the solicitation, proper procedure dictates that the offeror challenge the problem before submission of an offer. If the offeror declines to challenge the problem, the reviewing tribunal may find that the offeror waived its right to protest."), *aff'd*, 39 F.3d 1198 (Fed.Cir.1994) (table). Defendant also argues that MIE agreed to certain consideration—the benefit of their bargain with the government—and to permit additional compensation under such circumstances would be unfair to both the government and to other bidders, citing *American Electric Contracting Corp. v. United States*, 217 Ct. Cl. 338, 579 F.2d 602 (1978).

The United States Court of Claims, in *American Electric*, stated that:

To allow plaintiff to bid, obtain the award and the contract as the lowest bidder, and only after beginning performance claim additional compensation on the ground that there was a procedural irregularity by the Navy in following its regulations prior to the award, would tend to undermine the fairness of the competitive bidding process. A contractor who was aware of the procedural irregularity would be able to submit a lower bid than his competitors on the assumption that if he raised the irregularity after he received the award he would receive additional compensation even if the total made his bid higher than those of his competitors. In addition, the procedural omission would permit him to extricate himself from specifications found to be more difficult or costly than originally anticipated. Plaintiff should be held to its voluntary contract commitment.

*Am. Elec. Contracting Corp. v. United States*, 217 Ct.Cl. at 359, 579 F.2d at 613.

Plaintiff contends that it has not waived the right to challenge the resolicitation merely because it has fully performed the contract. Plaintiff contends that it did not waive, but timely challenged the award of the contract to CCI through a protest to the GAO. The subject matter, however, of MIE's protest to the GAO was that the USMC

"improperly rejected it [MIE] as nonresponsible without referring the matter of its responsibility to the Small Business Administration for consideration under Certificate of Competency procedures ...." *TransTac Management Corp.: T.R.S. Research: Mexican Intermodal Equipment, S.A. de C.V.*, Comp. Gen. Dec. B–270074 (Oct. 31, 1995) (unpub.). The responsibility issues raised by MIE before the GAO are not raised in the action before this court, and the issues MIE raises in the instant action were not raised in plaintiff's earlier protest before the GAO. Nevertheless, MIE argues that, in its February 7, 1996, letter to the GAO withdrawing the request for reconsideration of the GAO's dismissal of its protest, plaintiff stated, "MIE does not waive any claims relating to actions undertaken by the USMC with respect to this procurement or the right to seek further review by the GAO or a court of competent jurisdiction, should such be necessary," and that it was a month later, on March 7, 1996, that MIE stated it was "forced" to submit a lower BAFO on the procurement at issue. A little over a month after that, on April 19, 1996, the USMC awarded the resolicited contract to MIE. Therefore, although MIE states that it believed it was being improperly forced to lower its bid price, it did not protest to the USMC when submitting the BAFO, when receiving the resulting award, or even before fully performing the contract.

The last dry-cargo containers had been delivered by MIE, and final payment on the contract was made by the USMC, on October 1, 1998. MIE submitted its claim to the contracting officer two years later, on October 11, 2000. Thus, the claim was presented four and one-half years after MIE had submitted its BAFO to the resolicitation on March 7, 1996, which is the focus of MIE's allegations before this court. If MIE believed that there was a violation of the FAR by the USMC, the time for protest in order to permit the USMC to take corrective action has long since passed, with the award, full performance and completion of the contract. MIE's timing limits any remedy to paying MIE a higher price for its cargo containers, which the government may not have been willing to pay at the time of negotiating the contract. MIE belatedly seeks the benefit of a bargain it did not make, which, if permitted by this court, would tend to undermine the fairness of the procurement process. As stated in the *American Electric* case, "Plaintiff should be held to its voluntary contract commitment." *Am. Elec. Contracting Corp. v. United States*, 217 Ct.Cl. at 359, 579 F.2d at 613.

Plaintiff cites the United States Court of Claims decision in *Chris Berg* for the proposition that, "[i]f officials of the Government make a contract they are not authorized to make, the other party is not bound by estoppel or acquiescence or even failing to protest." *Chris Berg. Inc. v. United States*, 192 Ct.Cl. 176, 183, 426 F.2d 314, 317 (1970) (citations omitted). Chris Berg, Inc. made mistakes in its bid on a solicitation, including, for example, a misplaced decimal. *Id.*, 192 Ct.Cl. at 178, 426 F.2d at 315. The contracting officer in *Chris Berg* suspected that errors had been made, and asked the contractor to recheck its bid. *Id.* During the recheck, the contractor discovered the errors and asked to be able to correct its bid. The government, however, would not permit a bid correction and resulting higher bid price. *Id.* The contractor "signed the contract in the amount [originally] bid, reserving its request for modification in an accompanying letter." *Id.* The contractor also pursued its protest with the GAO, before seeking redress before the Court of Claims. *Id.* The Court of Claims found that the procurement regulations at issue were written for the protection of bidders, and reformed the contract to reflect a corrected, and higher, bid price. *Id.*, 192 Ct.Cl. at 183, 426 F.2d at 318. Unlike in the present case, in *Chris Berg*, the government was aware of the mistake in bid before award. Unlike MIE, the contractor in *Chris Berg* complained of its mistake in bid both before and after award. In the present case, MIE's allegations of improper bid reopening and auction techniques were made only after voluntarily accepting award and fully executing performance, and after contract close out, limiting the remedy to a price increase for the cargo containers not agreed to by the government during contract negotiations.

Plaintiff also cites *LaBarge Products. Inc. v. West*, 46 F.3d 1547 (Fed.Cir.1995), decided by the United States Court of Appeals for the Federal Circuit twenty years after *Chris Berg*. The Federal Circuit in *LaBarge* considered, and cited, *Chris Berg*, but reached a different result. The *LaBarge* case involved an Army procurement for aluminum pipe sections and couplings. *Id.* at 1548. The court noted that a government official attempted, unsuccessfully, to steer the proposed contract to the Victaulic Company, on a sole source basis. *Id.* at 1549. The court also noted that LaBarge Products had informed the government during negotiations that they would be submitting a best and final offer in the "low 30's," and that, before best and final offers were due, Victaulic received an anonymous telephone call stating that the competition was going to bid in the "low 30's." *Id.* When LaBarge submitted the low bid, a government official attempted, unsuccessfully, to have LaBarge declared technically deficient. *Id.* LaBarge protested to the GAO, claiming that Victaulic was receiving preferential treatment, and requesting an award at its original bid, which was higher than its subsequent best and final offer. *Id.* at 1550. The Army nevertheless awarded the contract to LaBarge at its last, and lower, best and final offer. *Id.* After contract completion, LaBarge sought the benefit of its original bid price, based on an alleged conspiracy of government personnel to direct the contract to Victaulic. *Id.* The Federal Circuit, however, did not find for LaBarge. *Id.* at 1556.

The Federal Circuit characterized LaBarge's concerns as raising an issue of auction techniques prohibited by the FAR, noting that the prohibition on auctioning was for the benefit of the contractor. *Id.* at 1552. This is the same issue raised by MIE in the present case. However, unlike MIE, LaBarge, like the contractor in *Chris Berg*, raised its precise concerns in a GAO protest, before award, *id.* at 1550. The Federal Circuit in *LaBarge* concluded that:

> According to the government, LaBarge's allegations of government misconduct are the kind of allegations that are ordinarily made in pre-award bid protests, not after award of a contract. However, if govern-ment officials make a contract they are not authorized to make, in violation of a law enacted for the contractor's protection, the contractor is not bound by estoppel, acquiescence or failure to protest. *Chris Berg. Inc. v. United States*, 426 F.2d 314, 317, 192 Ct.Cl. 176, 183 (1970); *Rough Diamond Co. v. United States*, 351 F.2d 636, 639–43, 173 Ct.Cl. 15, 20–27 (1965), *cert. denied*, 383 U.S. 957, 86 S.Ct. 1221, 16 L.Ed.2d 300 (1966). In cases in which a breach of law is inherent in the writing of the contract, reformation is available despite the contractor's initial adherence to the contract provision later shown to be illegal. *Chris Berg. Inc.*, 426 F.2d at 317–18, 192 Ct.Cl. at 183 (contractor was entitled to reformation of a price increase after being denied leave to correct a mistaken bid in violation of applicable regulations, even though contractor had performed the uncorrected contract). Like the contractor in *Chris Berg. Inc.*, LaBarge may seek reformation of its price term, even after performance, if that term was allegedly diminished by unlawful government acts.

*Id.* at 1552–53. In spite of the above language, the Federal Circuit did not reach the issue of waiver, deciding instead that LaBarge would not recover due to the determination that the government had not engaged in prohibited auctioning conduct:

> The government argues that LaBarge waived its right to challenge the request for best and final offers because it did not pursue a pre-award bid protest. Because we affirm the Board's [Armed Services Board of Contract Appeals] conclusion that LaBarge cannot succeed on the merits of its claim, we need not address this issue.

*Id.* at 1556. The Federal Circuit in *LaBarge* stated that the issue was, "under what circumstances a request for best and final offers is improper after a government official has revealed information about a potential contractor's bid to a competitor." *Id.* at 1555. The Federal Circuit in *LaBarge* stated the test for deciding the issue: " 'The court concludes that an improper auction would occur if, absent a rational or reasonable basis for deeming that the offerors fell short of meeting the Navy's needs in this procurement . . .

[the Navy] were to act on its intention to reopen negotiations and accept new [best and final offers].'" *Id.* (quoting *Logicon, Inc. v. United States*, 22 Cl.Ct. 776, 788 (1991)) (alterations in original).

Like the *Logicon* court, we hold that the government may request further bids after violation of the FAR prohibiting revelation of information concerning a potential contractor's bid only if the government has a rational or reasonable basis for doing so unrelated to the violation. In this case, if the government's request for best and final offers was tainted by the motivation to direct the procurement to Victaulic, the request would be a sham, without a rational or reasonable basis.

*LaBarge Prods., Inc. v. West*, 46 F.3d at 1555.

The Armed Services Board of Contract Appeals in *LaBarge* found that the subsequent round of best and final offers was not a sham to direct the award to Victaulic, but was for the legitimate purpose of addressing the government's concern of having aluminum pipe sections and couplings produced by different manufacturers. The best and final offer round provided the government with an option to purchase the production tools and technical drawings to address this concern. *Id.* at 1555–56. Furthermore, the Board found that the contracting officer on the procurement was unaware of any attempt to direct the contract to Victaulic. *Id.* at 1556. The Federal Circuit concluded that the government's request for a last round of best and final offers, even after disclosures of LaBarge's prices to Victaulic, was not improper, given that the contracting officer was not trying to steer the award to Victaulic, but had a legitimate reason for the new round of best and final offers. *Id.* The Federal Cir-

cuit concluded that, "[d]isclosure of one offeror's bid does not make later negotiations *per se* illegal"; and, in fact, illegal auctioning was not found in the *LaBarge* case. *Id.*

In the present case, the USMC awarded the cargo container contract to CCI on October 2, 1995. Subsequent to this initial contract award, the abstract of bids, including CCI's contract award price and MIE's price bid, were released by the government pursuant to requests for information under the Freedom of Information Act, 5 U.S.C. § 552 (2000).

MIE, along with two other bidders on the cargo container contract, TransTac Management Corporation and T.R.S. Research, all protested the award of the contract to CCI to the GAO. In an October 23, 1995 Memorandum for the Record, subject: "Contracting Officer's Determination to Terminate Contract M67004–95–C–0052 [to CCI] for Convenience," the contracting officer indicated that he believed the TransTac Management Corporation's protest, concerning the country of origin of awardee CCI's cargo containers, to be without merit. MIE's protest, that, as a small business, its nonresponsibility determination should have been referred to the Small Business Administration, led the contracting officer to submit a letter to the Small Business Administration for a determination in that regard.[2]

The contracting officer's memorandum also addressed the protest of T.R.S. Research (TRS) to the GAO, which contended that the government failed to conduct meaningful discussions, in violation of FAR 15.610, by failing to advise TRS of deficiencies in its proposal or to resolve uncertainties regarding the TRS technical proposal. The contracting officer noted that the solicitation required vented, eight and one-half foot containers.

2. MIE subsequently requested reconsideration of the GAO's October 31, 1995 decision to dismiss the protests brought by MIE and the two other offerors of the cargo container award to CCI. In a January 18, 1996 response to MIE's request for reconsideration, the USMC stated that: "MIE did not receive the initial award because it received a negative PreAward Survey and thereafter, the SBA [Small Business Administration] definitively ruled that MIE has no standing as a small business to receive a CoC [Certificate of Competency]." MIE cited, and, therefore, was aware of the USMC's January 18, 1996 response to the GAO in a February 7, 1997 letter to the GAO withdrawing its request for reconsideration. MIE's February 7, 1996 letter did not contradict the USMC's statement, quoted above, that MIE was not eligible for a Certificate of Competency responsibility determination from the SBA, which was the substantive basis of MIE's protest to the GAO. Nor has MIE, in this court, contradicted the USMC's assertion that MIE's GAO protest regarding the Certificate of Competency was without any basis.

TRS submitted drawings with their initial proposal of eight and one-half foot containers, as required. However, in addition to the drawings, TRS submitted the picture of a container which the technical evaluator thought was an eight foot container. The contracting officer decided that "this picture clouded the evaluator's perception of the contractor's offer." The government also was not clear on whether the containers were to be manufactured in Italy or Turkey. However, in its initial proposal, TRS had identified manufacturers in Italy and Turkey, and, in its best and final offer, TRS added a third manufacturer in Italy. The TRS technical proposal was found to be technically unacceptable. The contracting officer believed that meaningful discussions might have assisted in resolving these matters associated with the TRS technical proposal. The contracting officer, therefore, concluded that meaningful discussions had not been conducted with TRS. The contracting officer stated:

4. It is the determination of the Contracting Officer after further consideration and review that the manner in which discussions with TRS were conducted was improper and resulted in an improper award. There is a high degree of confidence that GAO would sustain the protest under these circumstances and order a Termination for Convenience. Therefore, a Termination for Convenience of the contract and an immediate reprocurement of the containers is determined to be appropriate.

The Federal Circuit concluded in *LaBarge* that the disclosure of bids did not make the subsequent round of best and final offers *per se* illegal, and, in fact, illegal auction techniques warranting contract reformation were not found in *LaBarge*. See *LaBarge Prods., Inc. v. West*, 46 F.3d at 1556. In the instant case, there was an award to CCI, multiple GAO protests, a resulting termination of the award to CCI, and reprocurement based on the Marine Corps' continuing need for cargo containers. As in the *LaBarge* case cited by the plaintiff, the government in the present case had a reasonable basis for its resolicitation, even though the abstract of bids on the initial solicitation had been disclosed under the Freedom of Information Act. As in the *LaBarge* case, the court finds in the present case that the government did not engage in prohibited auction techniques.

*Plaintiff's Waiver of Its Challenge to the Resolicitation*

■ As noted earlier, the Federal Circuit did not actually reach the government's argument in *LaBarge* that plaintiff had waived its right to challenge the request for best and final offers because LaBarge did not pursue a timely protest. *Id.* Nevertheless, a reading of the opinions in both *Chris Berg* and *LaBarge* indicates that the contractors made timely protests on the issues presented to the adjudicatory fora in both of those cases, unlike in the present case, in which the government was unaware of the contractor's concerns before award. See *LaBarge Products, Inc. v. West*, 46 F.3d at 1550; *Chris Berg, Inc. v. United States*, 192 Ct.Cl. at 178, 426 F.2d at 315; *see also Hermes Consolidated. Inc. v. United States*, 58 Fed.Cl. 3, 14, 19 (2003) (discussing the challenges by the plaintiffs in both the *Chris Berg* and *LaBarge* cases), *subsequent opinion*, 58 Fed.Cl. 409 (2003). As noted earlier, in the present case, MIE waited until two years after the contract was closed out to protest the negotiated contract price; this was four and one-half years after MIE had submitted the best and final offer which belatedly formed the basis of its complaint.

The defendant relies on *Whittaker Electronic Systems v. Dalton*, 124 F.3d 1443, 1446 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1997), to support its contention that MIE waived, through inaction, its protest of alleged auction techniques. *Whittaker Electronic Systems*, in turn, relies on the earlier United States Court of Claims case of *E. Walters & Co. v. United States*, 217 Ct.Cl. 254, 576 F.2d 362 (1978). In *E. Walters & Co.*, the Army misused an option provision to obtain a lower price on fuses. The awardee, E. Walters & Co., believed it was entitled to a higher price, but made its claim only after full performance on the contract. *E. Walters & Co. v. United States*, 217 Ct.Cl. at 263, 576 F.2d at 366 (1978). The Armed Services Board of Contract Appeals denied the contractor's claim because the claim "had been waived by performance with-

out protest until after final delivery." *Id.,* 217 Ct.Cl. at 263, 576 F.2d at 367. The Court of Claims stated in *E. Walters & Co.:*

Granted that this use of the "option" provision was clearly prohibited by the procurement regulations, and for good and sufficient policy reasons, the fact that a procurement practice is prohibited does not necessarily mean that it is therefore actionable.

*Id.,* 217 Ct.Cl. at 263–64, 576 F.2d at 367 (footnote omitted). The Court of Claims in *E. Walters & Co.* agreed with the Armed Services Board of Contract Appeals that the contractor's failure to protest until after final delivery on the contract was a waiver. *Id.,* 217 Ct.Cl. at 264, 576 F.2d at 367. The contractor's failure to timely protest prejudiced the government "in consideration of other alternatives."[3] *Id.,* 217 Ct.Cl. at 265, 576 F.2d at 368. The ASPR [Armed Services Procurement Regulation] provisions violated by the Army in *E. Walters & Co.* were designed to discourage contingency costs in price proposals, and, therefore, to avoid prices which were unfair to either the government or the contractor. Provisions discouraging contingency costs are, therefore, at least partially for the benefit of bidders. *See id.,* 217 Ct.Cl. at 263–64 n. 4, 576 F.2d at 367 n. 4. Nevertheless, the Court of Claims found that the claimant's inaction waived its challenge.

The United States Court of Appeals for the Federal Circuit in *Whittaker Electronic Systems* cited *E. Walters & Co.,* and similarly found that the claimant, through inaction, had waived its challenge. In *Whittaker Electronic Systems,* the awardee failed to make a timely objection to an option clause in its contract, thereby waiving the right to challenge the validity of the contract under the Defense Acquisition Regulation (DAR). *Whittaker Elec. Sys. v. Dalton,* 124 F.3d at 1446 ("The doctrine of waiver precludes a

contractor from challenging the validity of a contract, whether under a DAR or on any other basis, where it fails to raise the problem prior to execution, or even prior to litigation.") (citations omitted); *see also Hermes Consolidated, Inc. v. United States,* 58 Fed. Cl. at 14–15, for a comprehensive discussion of both the *Whittaker Electronic Systems* and *E. Walters & Co.* cases. As in *E. Walters & Co.,* the DAR provisions at issue in *Whittaker Electronic Systems* were designed to avoid prices unfair to both the government and contractors, and, therefore, were, at least partially, for the benefit of bidders. *See id.* Nevertheless, the Federal Circuit found that the claimant's inaction waived its challenge.

The Federal Circuit's opinion in *American Telephone and Telegraph Co. v. United States,* 307 F.3d 1374 (Fed.Cir.2002), *reh'g en banc denied* (2003), *cert. denied,* ── U.S. ──, 124 S.Ct. 56, 157 L.Ed.2d 249 (2003), reiterates the waiver rules from the *Whittaker Electronic Systems* and *E. Walters & Co.* cases. In *AT & T,* the Navy awarded a fixed price contract to AT & T in violation of section 8118 of the Department of Defense Act, Pub.L. No. 100–202, § 8118, 101 Stat. 1329, 1329–84 (1987), which provided for constraints on the use of the fixed price contract form in large, developmental contract efforts. *Id.* at 1377. AT & T alleged that the Navy violated the FAR and Department of Defense (DOD) Directives by using the fixed price form of contract. *Id.* at 1379. As a result, AT & T sought reformation of the contract. *Id.* at 1377. The Federal Circuit determined that section 8118, the FAR and DOD directives did not create a cause of action enforceable in courts by private parties such as AT & T. *Id.* at 1379–80. The Federal Circuit also stated that:

In view of the facts of this case, this court would be forced to conclude that AT & T waived its present arguments even

---

**3.** The United States Court of Claims stated in *E. Walters & Co.* that:

Had plaintiff protested the use of the option provision at the time of award, defendant would have been in a position to either reaffirm its use of the option provision, in apparent disregard of the ASPR prohibition, with the further knowledge that it could later be faced with a claim for the Range F price, at an

additional cost of over $1 million; or it could have elected instead, to award the non set-aside quantity in the next least expensive manner, as previously discussed.... Plaintiff's silence deprived the Government of that relatively painless alternative.

*Id.,* 217 Ct.Cl. at 265, 576 F.2d at 368 (footnote omitted).

were those arguments to state a valid claim.... In short, the proper time for AT & T to have raised the issues that it now presents was at the time of contract negotiation, when effective remedy was available. This, AT & T did not do. For reasons evident above, even were AT & T to have stated a valid claim for reformation, this court's case law would require a finding that AT & T waived that claim. *Whittaker Elec. Sys. v. Dalton,* 124 F.3d 1443, 1446 (Fed.Cir.1997) ("The doctrine of waiver precludes a contractor from challenging the validity of a contract, whether under a DAR [defense acquisition regulation] or on any other basis, where it fails to raise the problem prior to execution, or even prior to litigation, on which it later bases its challenge.") (citing *United Int'l Investigative Servs. v. United States,* 109 F.3d 734, 738 (Fed.Cir.1997); *E. Walters & Co.,* 576 F.2d at 367–68).

*Id.* at 1381 (alteration in original); *see also Hermes Consolidated. Inc. v. United States,* 58 Fed.Cl. at 16–19 (discussing the *AT & T* case at length). Section 8118 and the FAR and DOD directives, limiting the use of fixed price contracts in large, developmental contracts, are for the benefit, at least in part, of contractors. Nevertheless, the Federal Circuit indicated that, even if AT & T had a valid challenge, the challenge would have been waived through failure to timely bring it.

The court in *Hermes* observed:

There is, of course, venerable authority that, wherever a contract not already fully performed is continued in spite of a known breach, the wronged party cannot avail himself of that excuse.... As a general proposition, one side cannot continue after a material breach by the other ... act as if the contract remains fully in force ... run up damages, and then suddenly go to court.

*Hermes Consolidated. Inc. v. United States,* 58 Fed.Cl. at 19 (quoting *Ling–Temco–Vought, Inc. v. United States,* 201 Ct.Cl. 135, 146, 475 F.2d 630, 637 (1973) (quoting *Northern Helex Co. v. United States,* 197 Ct.Cl. 118, 125–26, 455 F.2d 546, 551 (1972))) (alterations in original).

MIE protested before the GAO only the USMC's failure to refer MIE to the SBA for a responsibility determination. MIE submitted a best and final offer under conditions first challenged two years after full performance by MIE and full performance by the USMC. Moreover, MIE's challenge was made to the contracting officer four and one-half years after MIE had submitted the best and final offer that is the focus of its challenge. If MIE believed that there was a violation of the FAR by the USMC, the time for protest in order to permit the USMC to take corrective action has long since passed, with the award, full performance and completion of the contract. MIE's timing limits any remedy to paying MIE a higher price for its cargo containers, which the government may not have been willing to pay at the time of negotiating the contract. MIE belatedly seeks the benefit of a bargain it did not make, which, if permitted by this court, would tend to undermine the fairness of the procurement process. As in the *American Electric* case, "Plaintiff should be held to its voluntary contract commitment." *Am. Elec. Contracting Corp. v. United States,* 217 Ct. Cl. at 359, 579 F.2d at 613. MIE waived its challenge to the resolicitation of the cargo containers and related auctioning challenge.

*The Doctrine of Laches*

The government also contends that both of the MIE's claims are barred by the affirmative defense of laches. This doctrine is based on the public policy which discourages stale demands, because courts find it more difficult to do justice as memories fade, documents are lost, and witnesses become unavailable. *See Mackall v. Casilear,* 137 U.S. 556, 566, 11 S.Ct. 178, 34 L.Ed. 776 (1890); *see also Godden v. Kimmell,* 99 U.S. 201, 211, 25 L.Ed. 431 (1878); *Brown v. County of Buena Vista,* 95 U.S. 157, 161, 24 L.Ed. 422 (1877); *LaForge & Budd Constr. Co. v. United States,* 48 Fed.Cl. 566, 570 (2001). A contractor's failure to seek a remedy within a reasonable time may serve as the basis for dismissal of that contractor's complaint under the doctrine of laches. Dismissal based on the defense of laches may be proper regardless of whether the statute of limitations has tolled a given claim. *See LaCoste v. United States,* 9

Cl.Ct. 313, 315 (1986); *see also Cornetta v. United States,* 851 F.2d 1372, 1378 (Fed.Cir. 1988); *Pepper v. United States,* 794 F.2d 1571, 1573 (Fed.Cir.1986); *Software Testing Solutions, Inc. v. United States,* 58 Fed.Cl. 533, 536 (2003).

To prevail on a defense of laches, the defending party must show unreasonable, unexcused delay by the claimant, and prejudice to the other party. *JANA, Inc. v. United States,* 936 F.2d 1265, 1269 (Fed.Cir.1991), *cert. denied,* 502 U.S. 1030, 112 S.Ct. 869, 116 L.Ed.2d 775 (1992); *see also Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). To demonstrate prejudice, the defending party must show that allowance of the plaintiff's claim will cause that party either economic prejudice or prejudice in mounting a defense. *Cornetta v. United States,* 851 F.2d at 1378; *LaForge & Budd Constr. Co. v. United States,* 48 Fed.Cl. at 570. Economic prejudice to the defendant can occur, for example, because of a loss of time, money, or opportunity that would have been less likely had the plaintiff not delayed in bringing suit. *See Bridgestone/Firestone Research, Inc. v. Auto. Club de L'Ouest de la France,* 245 F.3d 1359, 1363 (Fed.Cir.2001); *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1033 (Fed.Cir.), *reh'g denied* (1992); *Software Testing Solutions, Inc. v. United States,* 58 Fed.Cl. at 536. Defense prejudice occurs when the defendant's ability to mount a defense is impaired due to circumstances that become more likely with the passage of time, such as loss of records, destruction of evidence, fading of memories, and witness unavailability. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d at 1033. In sum, the defendant bears the burden of proving both delay and prejudice. *LaForge & Budd Constr. Co. v. United States,* 48 Fed.Cl. at 570; *see also Costello v. United States,* 365 U.S. at 282, 81 S.Ct. 534; *Cornetta v. United States,* 851 F.2d at 1380.

The defendant asserts that MIE's claims should be barred by the doctrine of laches because MIE unduly delayed submitting its claims to the contracting officer. All of the events that fixed the USMC's liability for the claims at issue in this court occurred on or before March 7, 1996, when Mexican Intermodal alleges that it was forced to lower its offering price in the submission of its BAFO on the resolicitation. Thus, Mexican Intermodal delayed submitting its claim to the contracting officer until October 11, 2000, roughly for four-and-one-half years after the events that fixed liability occurred.

There are no predetermined exact boundaries to the length of time that are considered unreasonable by the courts and sufficient to support a laches defense. *See, e.g., Awtry v. United States,* 231 Ct.Cl. 271, 275–76, 684 F.2d 896, 898–99 (1982); *LaCoste v. United States,* 9 Cl.Ct. at 315–16. In *LaCoste,* the court found that the plaintiff had unduly delayed by waiting more than five years to bring its contract claim. *LaCoste v. United States,* 9 Cl.Ct. at 315–16. In *Awtry,* a delay of three-and-one-half years after the claim for unlawful dismissal accrued was found to be an unreasonable amount of time and the defense of laches was permitted. *Awtry v. United States,* 231 Ct.Cl. at 275–76, 684 F.2d at 898–99. "The general rule is that laches is an equitable doctrine that must be considered in light of the facts of each case." *Cornetta v. United States,* 851 F.2d at 1379; *see also Brown v. County of Buena Vista,* 95 U.S. at 160. In the present case, given the time that liability was fixed, the fact that the plaintiff knew of the events when they occurred, and the plaintiff's completion of contract performance before the claim was filed with the contracting officer, the court finds the length of time that it took the plaintiff to pursue its claim is unreasonable.

The passage of an unreasonable amount of time, however, is insufficient to bar suit under the doctrine of laches, unless such delay is unexcused. *Cornetta v. United States,* 851 F.2d at 1377–78. MIE seeks to explain its delay in submitting its claim to the USMC by asserting, without support other than the statement in the affidavit submitted by MIE's President, that the GAO bid protest "required substantial financial expenditure by MIE and left MIE in a financially precarious position." Poverty, by itself, however, is never an excuse for delays in filing suit, although it is a factor to be considered. *See*

*Leggett v. Standard Oil Co.,* 149 U.S. 287, 294, 13 S.Ct. 902, 37 L.Ed. 737 (1893); *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1554 (Fed.Cir.1996). MIE also argues that it needed time to find legal counsel for the prosecution of this complaint. Defendant correctly points out, however, that the plaintiff retained its counsel at least as early as 1996, when Edward Kim, the attorney of record on the complaint filed in this case, represented MIE during the company's bid protest at the GAO. MIE has submitted insufficient explanation and support to excuse its delay in bringing this action against the USMC. The court finds that the delay by Mexican Intermodal in submitting its claim is unexcused. *See Leggett v. Standard Oil Co.,* 149 U.S. at 294, 13 S.Ct. 902; *Hall v. Aqua Queen,* 93 F.3d at 1554.

MIE's unreasonable and unexcused delay can be invoked as a defense by the government if the defendant also can demonstrate that MIE's delay caused the government economic or defense prejudice. *See JANA, Inc. v. United States,* 936 F.2d at 1269. Although earlier precedent binding on this court indicated a willingness to accept assertions of presumption of prejudice or *per se* latches, the United States Court of Appeals for the Federal Circuit more recently has indicated that it now rejects the notion that a defendant "can rely on the presumption of prejudice, or shift the burden to plaintiff to show lack of prejudice if delay is long." *Cornetta v. United States,* 851 F.2d at 1378; *see also LaForge & Budd Construction Co. v. United States,* 48 Fed.Cl. at 572.

In the present case, the defendant has demonstrated that Mexican Intermodal's delay in filing this claim has caused harm to the government's ability to defend itself. One key participant in the events relevant to this case is unavailable because of the passage of time, and the whereabouts of another key witness is unknown. Thomas Deacher, the contracting officer who made the determination to cancel and resolicit, retired on August 31, 1998, after award of the contract to MIE. Mr. Deacher died on December 15, 1998, after contract close out. MIE did not file a claim with the contracting officer until October 11, 2000, nearly two years after Mr.

Deacher's death. In addition, Helen Daughtry, the contracting officer who replaced Mr. Deacher, has retired and her availability is unknown. The loss of the testimony of Mr. Deacher and potentially of Ms. Daughtry makes it far more difficult, and perhaps impossible, for the government to defend itself with regard to the key events at issue in this case, especially regarding the decision to resolicit. MIE's delay of four-and-one-half years before raising the concerns about its BAFO to the USMC, and nearly six years before filing a complaint with this court, makes application of the doctrine of laches in this case appropriate. The defendant has met its burden regarding the elements of the defense of laches. *See JANA. Inc. v. United States,* 936 F.2d at 1269; *see also Costello v. United States,* 365 U.S. at 282, 81 S.Ct. 534; *Mackall v. Casilear,* 137 U.S. at 566, 11 S.Ct. 178; *Godden v. Kimmell,* 99 U.S. at 211.

## CONCLUSION

Based on the documents in the record, the court finds that, in the above captioned case, the jurisdictional requirement of reciprocity included in 28 U.S.C. § 2502(a) is met for the country of Mexico. The court further finds that MIE waived its challenge to the USMC's resolicitation of cargo containers. The court also finds that the USMC did not improperly reopen discussions or engage in illegal auction techniques. Furthermore, the court finds that MIE unreasonably delayed bringing its claims, such that the claims are barred by the doctrine of laches. The clerk's office shall **DISMISS** the plaintiff's complaint, with prejudice, and enter **JUDGMENT** for the defendant, consistent with this opinion.

**IT IS SO ORDERED.**