**LAFORGE & BUDD CONSTRUCTION CO., INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 98–695C.

United States Court of Federal Claims.

Feb. 2, 2001.

Sammie Leo Arnold, Dyersburg, TN, for plaintiff. Adrian L. Bastianelli, III, Bastianelli, Brown & Kelly, Washington, DC, of counsel.

Paul D. Hoburg, Washington, DC, with whom was Assistant Attorney General David W. Ogden, for defendant. John Roselle, U.S. Army Corps of Engineers, Tulsa, OK, of counsel.

## *OPINION*

MILLER, Judge.

This contract dispute is before the court on defendant's motion for summary judgment upon the basis of laches. The contractor's global complaint, which alleges that the Government breached its contractual duties of good faith and fair dealing throughout the performance of the contract, was filed approximately seven years after substantial completion of the contract work. The issues to be resolved are (1) whether the contrac-

tor's delay was reasonable and excusable and (2) whether the delay has prejudiced the Government's defense. Argument is deemed unnecessary.

## FACTS

The following facts that are material are undisputed, unless otherwise noted, and all inferences have been drawn in favor of plaintiff as opponent. LaForge & Budd Construction Co. ("LaForge" or "plaintiff"), is a small business contractor that was awarded contract number DACA56–86–C–0074 from a sealed bid procurement by the U.S. Army Corps of Engineers (the "Corps") in September 1986. The contract was for the building of a transient munitions facility, including a taxiway, staging area, underground igloos, munitions shop facility, munitions magazines, access roads, and other related features (the "project") at Tinker Air Force Base ("Tinker") in Oklahoma. The contract required completion of the work within 595 calendar days of the Notice To Proceed receipt date, which was October 9, 1986.

Conflict plagued the project from the beginning. Early in the performance of the project, Thomas Logsdon, the Corps Area Engineer for Tinker, instructed the inspectors working under him to make life difficult for plaintiff. In 1987 Frank Mendoza, the initial Corps Construction Representative for the Transient Munitions Facility, resigned for fear that the project "wasn't going to be anything but a pissing battle between Tom Logsdon and D.E. Abbott [plaintiff's project vice-president]" and he did not want to get caught in the middle.[1] Deposition of Jerry Lawson [undated extracts], at 41. Jerry Lawson replaced the vacancy left by Mr. Mendoza, which involved ensuring contract compliance. According to Mr. Lawson, contract compliance on this project was inspected "much more stringently than was ever done anywhere in 22 years ...." Lawson Dep. at 287. On May 4, 1987, Mr. Lawson wrote a memorandum for record (the "May 4 memorandum") recording, in part, that Mr. Logsdon had given him "specific instructions concerning this particular contract." The

---

1. Both plaintiff and defendant have been unable to locate Frank Mendoza.

May 4 memorandum reported Mr. Logsdon as saying, " 'I want you to tighten down on those bastards and run them off Tinker Air Force Base within thirty days.' " [2]

Plaintiff charges that the Corps created problems and delays to the project, presumably resulting from Mr. Logsdon's instructions. The foreman of plaintiff's earthwork crew, Raymond L. Breeden, stated that during winter 1987, a Corps inspector told him that LaForge would probably be gone in 30 days, and that "pretty well everybody on the job knew that ... there was an immediate direction that we were going to be run off the job." Deposition of Raymond L. Breeden, Mar. 22, 2000, at 25–26. Mr. Breeden elaborated that the behavior of the Corps was consistent with what he had been told about the intent to run LaForge off the project in that the Corps found problems with "all kinds of little things that they nitpicked you to death on ...." *Id.* at 26. For example, the Corps rejected plaintiff's Quality Control Program and required that all work be stopped until it was revised, even though the program was similar to those used successfully on previous Corps contracts. Plaintiff also charged that the Corps delayed acquisition of excavation permits, acquisition of data required from the Corps to erect a boundary fence, approval of plaintiff's Network Analysis System, and coordination of patrol road closures that were required by the contract.

As a result of the frequency and number of the construction problems, plaintiff hired an engineering consultant, William F. Connole, to assist in the volume of paperwork regarding construction incidents.[3] Plaintiff also employed its attorney, S. Leo Arnold, as a "management consultant ... throughout the duration of the project." Mr. Connole testi-fied that by the spring of 1987 Mr. Abbott was frustrated with the lack of cooperation. Deposition of William F. Connole, Sept. 15, 1999, at 159. From his perspective, "there was going to be an overinspection-type claim on the job as early as the spring of [19]87." *Id.* at 158. Plaintiff, however, maintains that in 1987 it was still attempting to avoid a claim.

Performance interference problems allegedly continued throughout the duration of the project, resulting in "fifty-two individual Government caused impacts and delays ... which overlapped with each other." Pl.'s Br. filed Oct. 31, 2000, at 4. Plaintiff notified the Corps on multiple occasions of the problems experienced during construction. On December 4, 1987, plaintiff submitted a proposal for an equitable adjustment of $70,925.17 attributed to unsatisfactory materials. The Corps notified plaintiff on September 2, 1988, and again on November 23, 1988, that plaintiff was required to certify proposals for more than $100,000.00 (although plaintiff's claim was for less) and that the proposal would not receive consideration until it had been certified.

In May 1989 Messrs. Abbott and Connole met with Mr. Lawson.[4] Mr. Lawson played segments of a tape recording from a Corps staff meeting in which Mr. Lawson had participated. Connole Dep. at 45; Lawson Dep. at 354, 374, 379–82. The tape was consistent with what Mr. Lawson had written in the May 4 memorandum, and he played the tape because he felt he "had to look at every possible avenue [he] could take to protect [himself]." Lawson Dep. at 380–82.

Plaintiff's initial request for Corps documents under the Freedom of Information

---

2. Lt. Col. David Wooden, a contracting officer on the project from May 14, 1987, until November 24, 1987, stated that during his administration of the project he was not aware of any instructions to "run [LaForge] off Tinker Air Force Base," nor had he seen or heard of Mr. Lawson's May 4, 1987 memorandum. Declaration of David L. Wooden, Aug. 24, 2000, ¶ 5. Mr. Wooden asserts that he would "never have allowed the contract to be administered in such a manner had it been brought to [his] attention." *Id.*

3. Plaintiff insists that Mr. Connole was not hired to develop claims.

4. Mr. Connole testified that at the time of the meeting, plaintiff had filed a request under the Freedom of Information Act, 5 U.S.C.A. § 552 (West.1994 & Supp.1999) (the "FOIA"), and already had received the May 4 memorandum signed by Mr. Lawson. However, plaintiff contends that it did not receive the May 4 memorandum until August 23, 1989, in response to its FOIA request. Connole Dep. at 44; Abbott Decl. ¶ 6.

Act, 5 U.S.C.A. § 552 (West 1994 & Supp. 1999) (the "FOIA"), dated May 17, 1989, was rejected. After the meeting with Mr. Lawson, plaintiff made another FOIA request dated June 9, 1989, which was supplemented by letter dated July 19, 1989. The Corps provided some documents on August 21, 1989, including the May 4 memorandum, but noted that certain requested documents had been forwarded to the Initial Denial Authority in Dallas, Texas, for "a determination of their releasability."

On August 23, 1990, Mr. Logsdon sent a letter to plaintiff regarding the December 4, 1987 equitable adjustment proposal, stating in part:

> You have not provided some of the items that were requested from you in excess of two (2) years ago. From this, I can only assume that you either have no such materials or you have decided not to pursue them. Otherwise, you would have provided them to the Government long ago so as not to taint the materials with so much age that all parties have forgotten the facts.

Mr. Abbott responded on behalf of plaintiff in a September 14, 1990 letter stating that the Corps letter was "innocuous, self-serving, and false" because plaintiff had complied with all requests and that the Corps should provide documentation of any requests it believed to be outstanding. He reminded the Corps of the correspondence that was hand delivered on August 24, 1990, advising the Corps that plaintiff intended to file a claim covering the entire project. Mr. Abbott's letter concluded by encouraging the Corps to review the documents that plaintiff had received pursuant to its FOIA request if the Corps was "concerned about the fading of memories." Mr. Logsdon responded with another letter on September 28, 1990, declaring that "[t]he Government [was] not aware of the specific nature of [LaForge's] claim."

The contract work was considered substantially complete by the Corps on March 23, 1989.[5] Plaintiff submitted its CDA claim for $1.75 million based upon the total-cost method to the contracting officer on November 30, 1995. Throughout the life of the contract, the claim contended, the Corps participated in an "unreasonable and systematic campaign to improperly terminate LaForge for default." On December 1, 1995, plaintiff filed another claim concerning only "additional work on the stabilized aggregate base course" of the taxiway, and it certified plaintiff's December 4, 1987 proposal for an equitable adjustment of $70,925.17. Plaintiff has stipulated that the December 1, 1995 claim overlapped with the November 30, 1995 claim, but did not specify the amount of overlap. Plaintiff supplemented its December 1995 claim on September 3, 1996, to include delay costs in the claim, yielding a total loss as a result of the stabilized aggregate base course work of $760,105.00.

The Corps requested more specific information from plaintiff by letter dated January 26, 1996, as well as during a meeting October 23, 1996. Plaintiff responded on April 3, 1997, by submitting "narrative summaries" that clarified more than 50 instances of alleged malfeasance by the Corps, including claims relating to quality control, quality assurance inspections, testing, safety on the job, interference by the Corps, coordination of runway outages, problems with plaintiff's critical path schedule, unmarked cables, unsatisfactory soils on the job site, problems with the aggregate base course beneath the taxiway, and problems with the taxiway shoulders, among numerous other issues.[6]

On May 29, 1998, the contracting officer issued an 85–page decision which addressed each aspect of the claim, but did not discuss any delay in the filing of plaintiff's claim.

## DISCUSSION

Plaintiff brings this action pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–612 (1994 & Supp. IV 1998) (the "CDA"), under which a contracting party may appeal a contracting officer's final decision to the Court of Federal Claims in lieu of,

---

5. The work required for final completion, punchlist and warranty work, continued on the project through August 1990.

6. Plaintiff asserts that all the "narrative summary" items submitted on April 3, 1997, had been previously included in the November 1995 claim.

under 41 U.S.C. § 605, appealing the decision to an agency board. 41 U.S.C. § 609.

### 1. *Summary judgment*

Summary judgment is appropriate only when the moving party is entitled to judgment as a matter of law and no disputes over material facts that may significantly affect the outcome of the suit exist. *See* RCFC 56(c). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505; *see H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984) (noting that non-moving party shall "receive the benefit of all applicable presumptions, inferences, and intendments"). Indeed, because of the procedural posture of a case being considered on a motion for summary judgment,

> [t]here is no requirement that the trial judge make findings of fact. The inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson*, 477 U.S. at 250, 106 S.Ct. 2505 (footnote omitted).

### 2. *Laches*

■ Fundamental to laches is the maxim that equity aids the vigilant, not those who slumber on their rights. *Cornetta v. United States*, 851 F.2d 1372, 1375 (Fed.Cir. 1988). Laches is a fairness doctrine that implements the public policy of discouraging stale claims by barring recovery when a plaintiff's delay prejudices the proponent of laches by jeopardizing the court's ability "to arrive at safe conclusions as to the truth." *Deering v. United States*, 223 Ct.Cl. 342, 347, 620 F.2d 242, 244 (1980).

■ To invoke laches a party must show (1) that the delay from the time the claimant

knew or reasonably should have known of its claim against the party was unreasonable and inexcusable; and (2) that the delay caused either economic prejudice or injury to the party's ability to mount a defense. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed.Cir.1992) (en banc); *accord Cornetta*, 851 F.2d at 1377–78. The proponent of a laches defense has the burden of proving both elements, and the failure to do so will prevent the application of laches. *Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). The application of laches is within the discretion of the court and should not be made by application of "mechanical rules." *Aukerman*, 960 F.2d. at 1032 (*citing Holmberg v. Armbrecht*, 327 U.S. 392, 396, 66 S.Ct. 582, 90 L.Ed. 743 (1946)). Thus, the court must examine the facts against the well-established laches standards to determine if defendant has met its burden of proving both delay and prejudice.

#### 1) *Delay*

■ Although delay by plaintiff is the first element needed to establish a defense of laches, it is not enough to show merely a lapse of time from the date a cause of action first accrued. *See Cornetta*, 851 F.2d at 1377. To qualify for laches, a delay must be both unreasonable and unexcused. *Cornetta*, 851 F.2d at 1378; *see also Gava v. United States*, 225 Ct.Cl. 676, 679 n. 2 (1980). No fixed boundaries define the length of time deemed unreasonable, and the duration should be viewed in light of the surrounding circumstances. The period of delay is measured from the time the claimant knew or should have known about its claim to the date of the suit. *See Aukerman*, 960 F.2d. at 1032.

The project was considered substantially complete by March 23, 1989. Accordingly, almost all actions by the Corps giving rise to the complaint regarding the Corps' behavior during contract performance occurred from 1986 through 1989.[7] Defendant asserts that plaintiff "was fully aware of the basis for its

---

**7.** Plaintiff's continued punchlist and warranty work, which lead to further disputes with the

Corps, was not completed until August 1990.

claim by ... 1989, at the very latest."[8] Def.'s Br. filed Sept. 1, 2000, at 9. However, plaintiff waited until November 30, 1995, to file its total-cost claim—a delay of seven years. If plaintiff's unsatisfactory materials proposal for equitable adjustment, filed December 4, 1987, is considered, then the delay becomes nine years.

Plaintiff has acknowledged that "it knew the primary basis for its claim by mid–1989 and that it filed its claim in 1995" and that its delay in filing "was not caused by lack of knowledge of the basis for the claim." Pl.'s Br. filed Oct. 31, 2000, at 18. Plaintiff attributes its delay to the fact that it is "a small business concern with limited resources," *id.*, and thus had a difficult time trying to price and analyze each claim separately, as it originally had intended to present its claims.[9] Implausibly, plaintiff asserts it had a "good faith, reasonable belief that there was no urgency for submission of the claim." *Id.*

Mr. Abbott, plaintiff's project vice-president, was assigned the task of preparing and pricing the claim. Mr. Abbott's wife died shortly after the project was substantially completed in March of 1989, causing him to take time off from work. Mr. Abbott's first preparation of the claim started after receiving the Corps documents per his FOIA request. While plaintiff continued performing the wrap-up punchlist and warranty work, Mr. Abbott "worked on closing out the project [in] August 1990." Pl.'s Br. filed Oct. 31, 2000, at 19. Finally, Mr. Abbott began to price the impacts of the 52 problems individually in 1990 and 1991. Simultaneous with claim preparation from 1991 onward, Mr. Abbott also was assigned as a project manager on other jobs. Again, plaintiff ascribes that action to its being a small business lacking other qualified personnel to run the project it assigned to Mr. Abbott. Plaintiff also blamed the delay on the fact that the claims consultant working with Mr. Abbott left in 1993, at which point Mr. Abbott did not think the expenditure of resources to re-educate another consultant to be worthwhile.

When Mr. Abbott finally completed claim drafts in 1993 and 1994, after abandoning the initial goal of separately pricing the claims and adopting the total-cost method, the drafts were reviewed by others at LaForge. Plaintiff then elected to have Mr. Abbott make a final attempt to price the issues individually. Plaintiff asserts that the length of time spent attempting to avoid the total-cost method is supported by *Integrated Logistics Support Sys. Int'l, Inc. v. United States,* 47 Fed.Cl. 248, 260 (2000) (total cost method of damages "universally disfavored" because it absolves plaintiff's causation responsibility to prove causation). The final attempt to separate claims was unsuccessful, and after several more revisions the claim was filed in 1995.

The court must "consider and weigh any justification offered by the plaintiff for its delay." *Aukerman,* 960 F.2d at 1033. Some excuses which have been considered reasonable in the past include: wartime conditions, *Armstrong v. Motorola, Inc.,* 374 F.2d 764, 769 (7th Cir.1967); negotiations between the parties, *Baker Mfg. Co. v. Whitewater Mfg. Co.,* 430 F.2d 1008, 1013–14 (7th Cir.1970); and other concurrent litigation, *Jamesbury Corp. v. Litton Indus. Prod., Inc.,* 839 F.2d 1544, 1552–53 (Fed.Cir. 1988).[10] Financial instability alone, "no matter how real or extensive, is insufficient to excuse a delay in asserting a claim," but may be considered as a factor if there are other reasons which would excuse the delay. *Frank F. Smith Hardware Co. v. S.H. Pomeroy Co.,* 299 F. 544, 547 (N.Y.1924). Plaintiff's proffered reason for its delay is essen-

---

8. Defendant assumes that plaintiff obtained a copy of Mr. Lawson's May 4, 1987 memorandum by May 1989, before Mr. Lawson met with Messrs. Abbott and Connole. Plaintiff insists that it did not receive a copy of the May 4, 1987 memorandum until August 23, 1989, in response to its FOIA request. Regardless, plaintiff had possession of the memo by 1989.

9. To justify its administrative difficulties in preparing to file its claim, plaintiff complains that "[t]here were over fifty documented overlapping delays or changes to the work" and that "[it] had never encountered delays and changes of this magnitude and complexity." Pl.'s Br. filed Oct. 31, 2000, at 18. Plaintiff also points to "the fact that the Government copied 66,000 documents in this case as evidence of the magnitude of the undertaking." *Id.*

10. For a slightly longer discussion of reasonable excuses, *see Aukerman,* 960 F.2d at 1033.

tially that the claim was too complex for its limited resources. Even according plaintiff some latitude in that regard, plaintiff has not demonstrated that it was diligent over the seven-year delay.

### 2) *Presumption of prejudice*

■ The notion of presumed prejudice is based on the idea that "the longer the delay the less need is there to show, or search for, specific prejudice, and the greater the shift to the plaintiff of the task of demonstrating lack of prejudice." *Gersten v. United States*, 176 Ct.Cl. 633, 636, 364 F.2d 850, 852 (1966). In other words, the presumption of prejudice could be considered like a sliding scale: The longer the delay, the stronger the presumption of prejudice. A presumption with such a continuum of possible behavior is difficult to gauge, and thus the presumption of prejudice is more frequently discussed than applied. *Cornetta*, 851 F.2d at 1378.

While earlier precedent may have indicated a willingness to adopt the presumption of prejudice, *see, e.g., Pepper v. United States*, 794 F.2d 1571, 1574 (Fed.Cir.1986); *Deering*, 223 Ct.Cl. at 350, 620 F.2d at 246; *Brundage v. United States*, 205 Ct.Cl. 502, 509, 504 F.2d 1382, 1386 (1974), the Federal Circuit has soundly "reject[ed] the notion that the [G]overnment can rely on a presumption of prejudice, or shift the burden to plaintiff to show lack of prejudice if delay is long, to support the affirmative defense of laches." *Cornetta*, 851 F.2d at 1378. "If the [G]overnment invokes the affirmative defense of laches, it has the burden to show that it was prejudiced by a claimant's tardiness in filing suit." *Id.* at 1380. To do otherwise would undercut the very equity which laches serves, by eliminating the prejudice element and its corresponding burden of proof. *See id.* at 1379.

### 3) *Prejudice*

■ The second element that defendant must prove for a successful laches defense is that plaintiff's delay actually caused prejudice to the defendant. *See Gardner v. Panama R. Co.*, 342 U.S. 29, 31, 72 S.Ct. 12, 96

L.Ed. 31 (1951) ("where no prejudice to the defendant has ensued from the mere passage of time, there should be no bar to relief") (*quoted in Cornetta*, 851 F.2d at 1378). A defendant can allege two types of prejudice: economic and evidentiary. Economic prejudice focuses on the financial consequences to defendant, and possibly others, which could have been prevented by an earlier filing, should the plaintiff be successful in its claim. *See Aukerman*, 960 F.2d at 1033. Evidentiary prejudice is the hardship encountered in mounting a defense due to plaintiff's delay and may include unavailable witnesses, the loss or destruction of evidence, or faded memories. *See Cornetta*, 851 F.2d at 1378. Evidentiary prejudice may not only handicap the defendant's ability to make its case, but it also "undermin[es] the court's ability to judge the facts." *See Aukerman*, 960 F.2d at 1033.

Defendant claims evidentiary prejudice in the case at bar, contending that witnesses have been incapacitated or have vanished, important documents have been lost, and memories largely have faded over the years. Defendant reads the record as clearly showing that its ability either to inquire into or apprise itself of the facts surrounding this case has been significantly impaired. However, while defendant offers as proof occurrences that interfere with its defense, it does not demonstrate adequately that the harm caused by each occurrence was caused by plaintiff's delay.

Defendant first discusses the series of strokes suffered by Carl R. Sparks, the Corps assistant area engineer, which impaired his memory.[11] Defendant states that as "[Mr. Sparks] had knowledge relevant to many of the disputed issues ..., [t]he Government's defense would have been greatly aided by Mr. Sparks' full abilities and knowledge." Def.'s Br. filed Sept. 1, 2000, at 12. But defendant does not disclose the year in which Mr. Sparks suffered his unfortunate strokes, making it impossible for the court to determine if the harm to its defense could

---

11. However, defendant does not mention Mr. Sparks' deposition testimony that his "long-term memory is still fairly good ..." but that his

"short-term memory is extremely bad ...," so he may still be a viable witness. Deposition of Carl R. Sparks, Mar. 23, 2000, at 5.

have been avoided by an earlier filing by plaintiff.[12]

Defendant also claims to be prejudiced by lost documents, including nine months of the daily inspection reports prepared by the Corps and all the daily records prepared by both plaintiff's first superintendent and earthwork foreman. After stating that "[t]he prejudice flowing from such a wholesale loss of documents is self evident . . . ." Def.'s Br. filed Sept. 1, 2000, at 13, defendant stops short of establishing exactly what that the prejudice would be. Defendant attempts to illustrate prejudice with one example. Defendant offers a diary entry by George Munger, a quality control inspector and foreman for plaintiff, which mentions a deficiency not reported in plaintiff's Quality Control Report. The Corps' own Quality Assurance Report for that date cannot be found; thus, absent the diary, such information would be lost. Defendant implies that the court should presume that all missing diaries and documents would have provided such helpful information. However, defendant does not know when many of the missing documents disappeared and later admits that some of "these documents would have been unavailable even if LaForge had filed its claim in 1989 upon completion of contract performance." Def.'s Br. filed Dec. 20, 2000, at 9.

Plaintiff rejoins that, although preparing the claim was a slow process, it took no action to lead the Corps into believing that plaintiff would not be filing a claim. During the project performance, plaintiff notified the Corps of the problems that it was encountering and that it intended to file a claim when the project was complete. Plaintiff reminded the Corps that it would be filing a claim by letter dated June 1, 1992, to which the Corps responded and acknowledged plaintiff's intentions by letter dated June 4, 1992.

Plaintiff even goes so far as to characterize the Government's actions as leading it "to believe that there was no urgency, and the claim would be decided on its merits, regardless of when submitted." Pl.'s Br. filed Oct.

31, 2000, at 20. In the years following the letter exchange, according to plaintiff, the Corps administrators behaved in a manner indicating that a claim was expected. For example, the Corps sent notice of a change in contracting officers in 1993. The Corps continued to monitor the status of plaintiff's claim, and in July 1995 the contracting officer agreed to postpone final closeout of the contract until after the claim was submitted. The contracting officer considered and decided plaintiff's claim on its merits in 1998, issuing an 85–page decision which addressed each aspect of the claim.

It cannot be gainsaid that the explanations to date for Mr. Abbott's intermittent approach were not satisfactory, let alone adequate. Moreover, if this court's experience is any barometer, trying a case at the distance of 15 years reveals tentative memories and a documentary record with many gaps. The delay that plaintiff has failed to justify could impact plaintiff's justification for and substantiation of a total-cost approach. On the other hand, if the Corps really had contract personnel in place who were as disputious and arbitrary as plaintiff has portrayed, liability could well be established. *See Tyger Constr. Co., Inc. v. United States,* 31 Fed.Cl. 177, 181, 246–267 (1994) (holding both parties responsible for contract work delay after 1994 trial over disputes arising from 1983–86). Serious consideration of settlement is called for.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. Defendant's motion for summary judgment is denied without prejudice.

2. The parties shall file a Joint Status Report by February 16, 2001, proposing a deadline for discovery and scheduling pretrial and trial, not to exceed 5 days.

---

12. Similarly, defendant claims it is prejudiced by the "loss of Mr. Mendoza and Capt. Fields" because of their first-hand knowledge of a few events. Def.'s Br. filed Sept. 1, 2000, at 13.

Defendant does not mention when contact with the two witnesses was "lost," nor explain how a more timely filing by plaintiff could have avoided this loss.