# In the United States Court of Federal Claims

No. 26-510

Filed: April 15, 2026

Re-issued: April 21, 2026[1]

| | |
|---|---|
| ACTIVE DEPLOYMENT SYSTEMS, LLC, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| *Defendant,* | ) |
| | ) |

## OPINION AND ORDER

Upon returning to office, President Trump increased the enforcement of our immigration laws to address a national security threat he identified. To support that increased enforcement, he directed the hiring of a significant number of new Customs and Border Patrol agents. After Congress appropriated the necessary funds, many new agents were hired.

Now it is necessary to train them. Basic training for these agents is conducted at a residential facility in New Mexico. That facility, however, does not have enough housing, restrooms, laundry facilities, or dining facilities to accommodate the surge of new trainees. Therefore, it issued a procurement for temporary facilities.

Active Deployment Systems, LLC ("ADS") submitted a proposal to perform the work, but it was unsuccessful. It then filed a bid protest at the Government Accountability Office ("GAO") that triggered an automatic stay of contract performance. The agency, however, elected to override the automatic stay and this case followed. Because there is not yet an administrative record and a degree of urgency, ADS filed for a temporary restraining order or preliminary injunction to halt performance while the court determines the propriety of the automatic stay override. This requires the court to weigh the likelihood of success, ADS's irreparable harm, the balance of that harm to the Government's harm, and the public interest. Because these weigh against preliminary injunctive relief, the court denies the motion.

---

[1] The court initially issued this opinion under seal to allow the Parties an opportunity to propose redactions pursuant to the protective order. Because the Parties informed the court that they do not believe any redactions are necessary, *See* ECF No. 25, the court re-issues this opinion without redaction.

**I.     Background**

Within the Department of Homeland Security is the Federal Law Enforcement Training Centers ("FLETC").  FLETC operates several training facilities around the country that offer training to federal law enforcement personnel.  This case involves the construction of temporary housing facilities for trainees at FLETC's training facility in Artesia, New Mexico.

In 2025, FLETC issued a task order request for quotation number FLETCTHTS25 ("Solicitation") for a contractor to provide turnkey temporary housing facilities, including "dormitory rooms, laundry facility, an administrative space, and kitchen and dining facility." Pltf's Mot. Ex. 1, Attach. L, at 2 (ECF No. 20-1).[2]  FLETC issued the Solicitation to all holders of the Department of Homeland Security Strategic Sourcing Vehicles Temporary Facilities and Services Blanket Purchase Agreement.  The procurement was conducted under Federal Acquisition Regulation ("FAR") Part 8.  The Performance Work Statement ("PWS") explained that the work included:

- Site preparation

- All maintenance and utility requirements to include plumbing and electrical systems

- All equipment, tools, materials, operations & maintenance labor

- All infrastructure & construction outlined in this proposal

- All janitorial & housekeeping services requirements

- Turnkey management, operations, maintenance, janitorial and laundry services

- Kitchen and dining facility – Climate controlled structure with the ability to serve and seat 350 personnel at a time and 500 per meal period.

Pltf's Mot., Ex. 1, Attach. L, at 2 (highlight removed).  On March 4, 2026, FLETC informed ADS that it was not the successful offeror.  ECF No. 1 ¶ 27; Pltf's Mot., Ex. 1, Attach B. and Attach. E.

On March 16, 2026, ADS filed a protest at the Government Accountability Office ("GAO").  ECF No. 1 ¶ 35.[3]  Under the Competition in Contracting Act ("CICA"), the filing of

---

[2] Although there were amendments to the Solicitation during the procurement, the court refers to the final version of documents unless otherwise stated.

[3] Although ADS does not specify the date it filed its GAO protest, the GAO's docket shows that ADS filed on March 16, 2026.  *Active Deployment Systems, LLC (FLETCTHTS25)*, U.S. Government Accountability Office (Mar. 16, 2026), https://www.gao.gov/docket/b-424330.1.

this protest triggered the automatic stay of performance for the duration of the GAO protest. 31 U.S.C § 3553(d)(3)(A)(ii). On March 18, 2026, agency counsel notified the GAO that the lapse of appropriation for much of DHS would be affecting the agency's ability to participate in the protest. Pltf's Mot., Ex. 2, Attach. A.

Also on March 18, 2026,[4] FLETC's Head of Contracting Activity, Procurement Division, Mission and Readiness Support Directorate issued his Determination and Findings ("D&F") to override the CICA stay. Def's Appx at A2-A3 (ECF No. 21-1). The D&F asserts an urgent and compelling need for the "[i]mmediate availab[ility] of temporary facilities, including housing, restrooms, and dining accommodations" to accommodate a surge of new Customs and Border Protection agents. *Id*. This hiring stems from Executive Order 14159 ("Protecting the American People Against Invasion"), which directed the hiring of new agents. *Id.* (citing 90 Fed. Reg. 8443 (Jan. 29, 2025)). The D&F also finds that the inability to house the new trainees will disrupt their training, potentially expose them to unsafe living conditions, and lessen CBP's ability to perform its national security mission. *Id.* And it will prevent FLETC from performing its mission of training federal law enforcement in FLETC-provided, safe housing. *Id.* On March 19, 2026, FLETC provided notice to the GAO of the stay override. Pltf's Mot., Ex. 2, Attach. B.

On April 2, 2026, ADS filed this case and moved for a temporary restraining order and for a preliminary injunction, arguing that the override was arbitrary and capricious primarily because FLETC failed to issue a D&F, which FLETC did not file with the GAO or otherwise provide to ADS. ECF Nos. 1, 4. The court held its initial conference with the parties on April 7, 2026. Shortly before that conference, the Government filed the D&F with the court and served it on ADS. ECF No. 11.[5] On April 9, 2026, ADS supplemented its motion for preliminary relief concerning the merits of the D&F, ECF No. 20, and the Government responded to ADS's motion, ECF No. 21. The court held oral argument on April 10, 2026. The matter is now ripe for a decision.

## II. Jurisdiction and Standard of Review

This court has jurisdiction to hear this claim that the United States, acting through FLETC, violated a procurement statute—CICA—in connection with a procurement. 28 U.S.C. § 1491(b)(1); *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1288–90 (Fed. Cir. 1999). Under 28 U.S.C. § 1491(b)(4), the court reviews agency decisions under the standard in the Administrative Procedure Act, 5 U.S.C. § 706. The "court is not to substitute its judgment for that of the agency . . . . In reviewing that explanation, a court must consider whether the decision was based on a consideration of the relevant factors and whether there was a clear error of judgment." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

---

[4] Although the D&F is dated March 17, 2026, Def's Appx at A2, the head of the contracting authority signed it on March 18, 2026, *id*. at A3.

[5] The court generally cites to the D&F filed in the Government's Appendix. The court only cites to the ECF No. 11 in this procedural history.

## III.   Discussion

"The granting of a temporary restraining order 'is an extraordinary and drastic remedy,' as is the granting of a preliminary injunction." *Safeguard Base Operations, LLC v. United States*, 140 Fed. Cl. 670, 686 (2018) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)) (cleaned up). Preliminary relief "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek*, 520 U.S. at 972. To determine whether to grant a preliminary injunction, the court considers the "(1) likelihood of success on the merits of the underlying litigation, (2) whether irreparable harm is likely if the injunction is not granted, (3) the balance of hardships as between the litigants, and (4) factors of the public interest." *Safeguard Base Operations*, 140 Fed. Cl. at 686 (citing *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1165 (Fed. Cir. 2014)). While "[n]o single factor is determinative," *Contracting Consulting Eng'g LLC v. United States*, 103 Fed. Cl. 706, 709 (2012), "a movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001). The absence of one factor alone may be sufficient to deny preliminary injunctive relief. *See Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 953 (Fed. Cir. 1990).

Although ADS styles its motion as one for a temporary restraining order or preliminary injunction, it does not appear that is what ADS really seeks. Both a TRO and preliminary injunction are to preserve the status quo until this court can resolve the case. Typically, this is to allow the production of the administrative record and briefing. Here, much of ADS's discussion addresses the entire period of the GAO protest—permanent relief. And the Government requests a bond for the duration of the GAO protest. Neither party asserts that any further record is necessary to resolve this case. In other words, it is unclear why ADS's motion is one for preliminary injunctive relief because it is not clear there is anything left for the court to do.

### A.   Likelihood of Success on the Merits.

#### 1.   <u>Standard for urgent and compelling need.</u>

An agency may override CICA's automatic stay upon a determination that it is "in the best interests of the United States" or there are "urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General." 31 U.S.C. § 3553(d)(3)(C)(i).[6] Here, FLETC relies only on the alleged

---

[6] At oral argument, Government counsel conceded that FLETC never issued a stop work order and that he counseled FLETC that it erred because CICA requires the contracting officer to issue the stop work order upon receiving notice of the filing of a GAO protest. *See* 31 U.S.C. § 3553(d)(3)(A). CICA only allows the override to take effect *after* the head of the contracting activity issues the D&F and the agency provides notice to the GAO. *Id*. § 3553(d)(3)(C)(ii). Allowing performance before the GAO notice violates CICA. *Gemini Tech Servs., LLC v. United States*, No. 25-1337C, 2025 WL 2674585, at *2 (Fed. Cl. Sept. 8, 2025). That error, however, is not pertinent to whether the D&F is arbitrary and capricious.

urgent and compelling need for temporary facilities to house trainees as a justification for overriding the stay.

The urgent and compelling circumstances prong imposes a higher bar than the best interests justification. *Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 387 (2013). This is because "[w]hen the GAO sustains a protest for which the automatic stay was overridden on *best interests* grounds, its recommended action shall be 'without regard to any cost or disruption from terminating, recompeting, or reawarding the contract.'" *Id.* (quoting 31 U.S.C. § 3554(b)(2)) (emphasis added). But if an override is based on urgent and compelling circumstances, "the GAO is free to take such cost or disruption into account when deciding what to recommend." *Id.*

Analogizing to the CICA provision allowing for sole source procurements, this court has reasoned that "[a] threat of immediate harm to health, welfare or safety would appear to qualify as 'urgent and compelling circumstances' for the purposes of CICA stay overrides." *PMTech, Inc. v. United States*, 95 Fed. Cl. 330, 346 (2010); *see also Supreme Foodservice*, 109 Fed. Cl. at 387. Further, potential threats to national security operations can support an agency's urgent and compelling circumstances determination. *See The Analysis Group, LLC v. United States*, No. 09-542C, 2009 WL 3747171, at *3 (Fed. Cl. Oct. 30, 2009); *Gemini Tech Servs., LLC v. United States*, No. 25-1337C, 2025 WL 2674585, at *8 (Fed. Cl. Sep. 8, 2025).

The court will only vacate the CICA override if FLETC "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

In *Reilly's Wholesale Produce, Inc. v. United States*, 73 Fed. Cl. 705 (2006), Judge Allegra surveyed CICA override cases and set forth a framework for analyzing the likelihood of success. He concluded that the court and agency must consider:

> (i) whether significant adverse consequences will necessarily occur if the stay is not overridden;
>
> (ii) whether reasonable alternatives to the override exist that would adequately address the circumstances presented;
>
> (iii) how the potential cost of proceeding with the override, including costs associated with the potential that GAO might sustain the protest, compare to the benefits associated with the approach being considered for addressing the agency's needs; and
>
> iv) the impact of the override on competition and the integrity of the procurement system, as reflected in the Competition in Contracting Act.

*Reilly's Wholesale*, 73 Fed. Cl. at 711 (citations omitted). The *Reilly's* framework, however, is discretionary—neither this court nor an agency is required to apply these factors to prove that a CICA override decision was rational. *Safeguard Base Operations, LLC v. United States*, 792 F. App'x 945, 948 (Fed. Cir. 2019) ("We note that the *Reilly's* factors do not even bind the [Court of Federal Claims], . . . let alone comprise an indispensable aspect of agency rational basis.").

In this case, the Parties both argue the likelihood of success twice, once under *State Farm* and again under *Reilly's Wholesale*. *See* ECF No. 20-1 at 12-22; ECF No. 21 at 11-18. This proved unnecessarily redundant. The court will address the CICA override under *State Farm* and consider the *Reilly's Wholesale* factors within that framework to the extent they are relevant. ADS Is Unlikely to Show that FLETC's CICA Override Determination Was Arbitrary and Capricious

At the outset, the court recognizes that the D&F is not the most detailed document that an agency has generated to support the override of a CICA stay. The court's task, however, is to determine whether the D&F is arbitrary or capricious, not whether it could say more.[7] Thus, the issue is whether FLETC's decision to override the CICA stay because of the asserted urgent need for safe and healthful temporary housing for CBP trainees was arbitrary, capricious, or otherwise not in accordance with the law.

> a)      *FLETC Did Not Rely on Factors That Congress Did Not Intend for it to Consider*

The D&F traces the need for immediate housing to Executive Order 14159, signed on January 20, 2025, which declares that "[e]nforcing our Nation's immigration laws is critically important to national security and public safety of the United States." § 1, 90 Fed. Reg. 8443. Executive Order 14159 directs various changes to immigration policy, prioritizing securing the border and enforcement of immigration laws. Most relevant here, the Executive Order provides that "[s]ubject to available appropriations, the Secretary of Homeland Security, through the Commissioner of U.S. Customs and Border Protection and the Director of U.S. Immigration and Customs Enforcement, shall take all appropriate action to *significantly* increase the number of agents and officers available to perform the duties of immigration officers." *Id.* § 21 (emphasis added). These new agents and officers are to support the added enforcement of immigration laws that the President ordered.

Congress soon appropriated funds to implement this new hiring. On July 4, 2025, the President signed the One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 (2025) which contained several provisions relevant to this protest. First, it appropriated $4.1 billion to hire and train additional Border Patrol agents. *Id.* § 90002(a)(1). Second, it appropriated another $2

---

[7] During oral argument, ADS pointed out that agencies in other cases provided more justification for CICA overrides. But the cases ADS pointed to were for Army contracts that were subject to the then-existing Army FAR supplement that required the Army to "clearly address" each of the *Reilly's Wholesale* factors. *Gemini Tech Servs., LLC v. United States*, No. 25-1337C, 2025 WL 2674585, at *5 (Fed. Cl. Sept. 8, 2025); *Fisher Sand & Gravel Co. v. United States*, 143 Fed. Cl. 247, 251 (2019). That requirement explains the more detailed analyses in those cases but does not undermine the sufficiency of FLETC's D&F.

billion for hiring and retention bonuses. *Id.* § 90002(a)(2). Third, it appropriated $285 million for FLETC to support the training of the new personnel. *Id*. § 100053(b). Finally, it appropriated $465 million for construction and improvements at FLETC facilities. *Id.* § 100053(c).

Once funding was in place, hiring got under way. Because FLETC projected it would need to house an additional 500 trainees per day, *see* Def's Appx at A3, it issued the solicitation for temporary housing. FLETC issued the BPA call to Greenlight on March 4, 2026. Pltf's Mot., Ex. 1, Attach. B, at 1. According to the D&F, Greenlight began performing the next day on an accelerated timeline to ensure that the temporary facilities would be fully operational by May 1, 2026. Def's Appx at A3. Twelve days later, ADS filed a protest of Greenlight's award at the GAO, triggering CICA's automatic stay provision.

Faced with the possibility of a 100-day delay, FLETC considered whether to override the stay. First, it looked to its legal obligations and observed that (1) Executive Order 14159 requires DHS to significantly increase the number of immigration officers, (2) FLETC is statutorily obligated to provide housing and training to trainees,[8] and (3) OMB Circular No. A-11 requires that those facilities be safe. *Id.* at A2. Second, it considered the existing facilities' capacity and determined that they would not be able to accommodate the influx of trainees projected over the coming months (five hundred per day from March 5, 2026 through March 4, 2027). *Id.* at A3. Third, it looked to alternate accommodations, including hotels and short term-rentals, and determined that they would not "meet requirements for security, proximity, or operational control." *Id.* Finally, it considered the potential costs of a delay and found that it would be detrimental to training operations, operational readiness, national security, and trainee health and safety. *Id.*

FLETC does not appear to have relied on factors which Congress has not intended it to consider. To the contrary, the factors discussed in the D&F—FLETC's legal obligations, the existing facilities' capacity, the availability of alternative accommodations, and the potential cost of a delay—are squarely relevant in determining whether there are urgent and compelling circumstances sufficient to justify a CICA override. Indeed, this court has recognized that harm to health, welfare, or safety is a "legitimate basis for a CICA override based on urgent and compelling circumstances." *PMTech*, 95 Fed. Cl. at 349. And this court has found that potential disruptions to federal law enforcement officer training and operations are "significant adverse consequences" that can support an agency's urgent and compelling determination. *Safeguard Base Ops.*, 140 Fed. Cl. at 699-702.

ADS argues that because Executive Order 14159 and OMB Circular No. A-11 do not state that "any delay . . . would be catastrophic to DHS's operations," they do not "provide any justification for overriding the Congressionally mandated stay of performance." Pltf's Mot. at 12-13 (ECF No. 20-1). Although Executive Order 14159 does not expressly address the consequences of a CICA stay, it nevertheless supports the urgency of providing temporary housing facilities at FLETC. Nobody disputes that the Executive Order had its desired effect—

---

[8] *See* 6 U.S.C. § 464(e) ("Notwithstanding any other provision of law, individuals attending training at any FLETC facility shall, to the extent practicable and in accordance with FLETC policy, reside in on-FLETC or FLETC-provided housing.").

CBP has hired many new agents. Nor is there any dispute that FLETC must train these new hires or that Congress appropriated the funds for that purpose. Because adequate training facilities at FLETC are necessary to effectuate a "significant increase in the number" of CBP agents, it follows that the federal government considers these facilities an urgent necessity. Accordingly, while these authorities do not impose a deadline for performance, they nevertheless support the rationality of FLETC's override decision.

> b)      *FLETC Has Not Failed to Consider an Important Aspect of the Problem*

Nor has FLETC "failed to consider an important aspect of the problem" when deciding to override the CICA stay. As discussed above, FLETC assessed its legal obligations, FLETC Artesia's capacity, reasonable alternatives, and the likely costs of a delay. Based on these factors, it does not appear irrational for FLETC to have determined that "urgent and compelling circumstances significantly affecting the interests of the United States w[ould] not permit waiting for the Government Accountability Office's decision, and that continued contract performance [was] required." Def's Appx at A3.

First, ADS argues that FLETC failed to consider the consequences of the GAO sustaining ADS's underlying bid protest. But ADS raises this contention primarily under the third factor of *the Reilly's Wholesale* framework, which concerns the balance between the potential costs of an override (including the risk of a sustained protest at the GAO) and its anticipated benefits. Although ADS is correct that the D&F does not explicitly discuss the GAO protest, this argument still fails. To begin with, it is not fatal for FLETC to omit the *Reilly's* factors because it was not required to consider them. In the year's following Judge Allegra's decision, judges of this court were split on whether an agency *must* apply the *Reilly's* factors when considering a CICA override. *Compare Nortel Gov't Sols., Inc. v. United States*, 84 Fed. Cl. 243, 247 (2008) ("Failure by an agency to consider just one of these factors is fatal to an override decision based on urgent and compelling circumstances.") *with PMTech*, 95 Fed. Cl. at 345 ("The court's focus should be on whether the CICA stay override decision was rational and whether the agency considered relevant factors, not on whether the agency conformed its analysis to a specific framework elaborated by this court."). The Federal Circuit since made clear that these factors "do not even bind the [Court of Federal Claims], let alone comprise an indispensable aspect of agency rational basis." *Safeguard Base Operations*, 792 F. App'x at 948. Accordingly, FLETC's failure to explicitly invoke or apply the *Reilly's* factors—standing alone—does not render its CICA override decision arbitrary and capricious.

Although the D&F does not explicitly discuss the impact of the GAO potentially sustaining ADS's protest, it appears to contemplate such costs. Given the existing facilities' limitations, the lack of reasonable alternatives, and the potential consequences of a disruption or delay in performance, FLETC concluded that it could not wait for the GAO's decision. The cost balancing is implicit in the D&F's discussion of harm: if FLETC did not override the stay, a bottleneck in the federal immigration enforcement apparatus would likely result, leaving potentially hundreds of new officers untrained. Given the magnitude of the delay-related harms identified in the D&F, the agency's analysis reasonably suggests that it viewed those costs as outweighing the risk of a potential GAO decision agreeing with ADS.

Second, ADS argues that FLETC failed to consider the alternative[9] of moving CBP agent training to another FLETC residential facility.  ECF No. 20-1 at 14 (citing Artesia, New Mexico, FLETC.gov, https://www.fletc.gov/artesia-new-mexico) ADS notes that FLETC has residential training facilities in Glynco, Georgia, and Charleston, South Carolina, but the D&F does not address whether moving CBP training to one of these facilities is a potential alternative.  The question is whether the D&F fails to consider *reasonable* alternatives to the override.  As the Government responded during oral argument,[10] it does not believe that this is a reasonable alternative because FLETC has constructed facilities at FLETC Artesia that are tailored to CBP training that cannot be replicated in Georgia or South Carolina.  The court notes that the website ADS relies upon appears to support the Government's argument in that it discusses the 3,400 acre "range" where practical training takes place to simulate real world environments.  Artesia, New Mexico, FLETC.gov, https://www.fletc.gov/artesia-new-mexico; *see also* Border Patrol Academy Unified in Artesia, CPB.gov, https://www.cbp.gov/about/history/cbp-20-20-establishment/border-patrol-academy-unified-in-artesia ("In 2013, $1.2 million was dedicated to enhance Border Patrol training with more realistic border patrol training settings like backdrops of a border wall, a simulated field environment, or a mock detention facility.").

Finally, ADS relies on a CBP website to show that border encounters are "at a record low."  Pltf's Mot. at 17 (citing U.S. Customs & Border Protection, *Border Crossings Once Again at a Record Low in November 2025* (Dec. 4, 2025) (available at https://www.dhs.gov/news/2025/12/04/border-crossings-onceagain-record-low-november-2025)).  ADS argues that "[t]his information shows that DHS does not have any overwhelmingly urgent enforcement needs, such that FLETC must immediately allow Greenlight to begin performance of the order." *Id*. at 18.  This argument does not hold water.  A decline in border encounters does not eliminate CBP's enforcement obligations, nor does it speak to its operational requirements for training personnel.  It may well be that increased enforcement along the Southern Border has proven effective, but that does not mean that CBP can maintain that level of enforcement without the new officers and agents that Executive Order 14159 called for.  Moreover, FLETC, as a component of DHS, is not charged with independently reassessing DHS's enforcement priorities—and neither ADS nor this court is positioned to do so in the first instance.  *See* 28 U.S.C. § 1491(b)(3) ("In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.").

In the end, ADS has not shown that FLETC failed to consider an important aspect of the CICA override.

---

[9] The D&F does not address the possibility of a bridge contract presumably because there is no incumbent contractor to issue a bridge contract to.  Pltf Mot., Ex. 1, Attach. D, at 3 (Solicitation § 9.0) ("Predecessor Contractor Information: Not Applicable").

[10] Given the expedited briefing, the Government only had a few hours to address specific arguments in ADS' motion, and ADS had no opportunity to reply before oral argument the next day.  The court thus afforded the Parties leeway to make arguments during the oral argument that may not have been fully flushed out in their briefs.

*c)      FLETC Did Not Offer an Explanation that Runs Counter to the Evidence*

The D&F is not contradicted by the evidence before the court. ADS contends that neither the Executive Order nor OMB Circular A-11 justify overriding the CICA stay. Pltf's Mot. at 12. In ADS's view, they only required the "appropriate action" to hire additional agents. *Id.*. The court is not convinced.

As explained above, Executive Order 14159 directs increased immigration enforcement and for DHS to "significantly" increase the number of agents. Other cases addressing Executive Order 14159 have recognized the national security interests identified in that order justified CICA overrides based on the records of those cases. *E.g.*, *Gemini Tech. Servs. v. United States*, No. 25-1337, 2025 WL 2674585, at *7 (Fed. Cl. 2025); *cf.* Safeguard Base Operations, 140 Fed. Cl. at 700 (discussing Executive Order 13767, which President Trump issued in his first term and similarly called for increased immigration enforcement and hiring). To be sure, every CICA override is fact-specific, and these prior cases do not compel any particular result here. But they undermine the contention that just because the Executive Order called for "appropriate action" means that there is no urgent need.

One other issue arose during oral argument that needs addressing. With its response, the Government submitted a declaration from FLETC's Chief of the Glynco Operations Branch, who has been assigned to assist FLETC Artesia with procuring temporary housing. Def's Appx at A4-A8 ("Cavanaugh Declaration"). According to her, the declaration is meant to show the harm that FLETC would suffer if the court issues injunctive relief reimposing the CICA stay. *Id.* ¶ 1; *see also* Def's Mot. at 1 & n.1. She explains the number of trainees currently enrolled, the projections for trainees per day through the summer, the capacity to house them, the inability to house them off-site, and the impacts of overcrowding on training. This, however, *is* the harm that justifies the urgent and compelling need. In other words, this is the bailiwick of the head of the contracting activity and "may not be delegated." 31 U.S.C. § 3553(e). In these circumstances, the court does not consider the declaration insofar as it seeks to support, explain, or justify the D&F.[11]

That said, during oral argument ADS asserted that the Cavanaugh Declaration contradicted the D&F, which states that "[c]urrent lodging capacity at the Federal Law Enforcement Training Centers Artesia location is fully utilized and cannot accommodate an additional five hundred trainees per day, which are projected to be present throughout the period of performance beginning March 5, 2026, through March 4, 2027." Def's Appx at A3. According to the Cavanaugh Declaration, however, "[a]s of the date of this statement, the student count at FLETC Artesia is 1,687, and the on-center room capacity is 2,186 beds." *Id.* at A4. While there is potential inconsistency between the statements, it is not clear that they are in conflict. The D&F was issued on March 19, 2026, while the Cavanaugh Declaration was dated April 9, 2026. It is certainly feasible that training classes ended, reducing the number of trainees

---

[11] As discussed below, when considering ADS's irreparable harm the court does consider the Cavanaugh Declaration insofar as it provides the current progress of the construction of the temporary facilities.

on site.  And the Cavanaugh Declaration is aligned with the D&F as to the need for more housing:

> By May 12, 2026, the daily average student population is expected to reach 2,299, which will exceed available on-center capacity. Current projections indicate that the student surge will peak sometime between May 21, 2026 and June 25, 2026.[12]  The FLETC Artesia lodging facility will not be able to accommodate the projected increase to between 2,500 and 2,800 trainees on site each day by the end of the Fiscal Year 2026.

Def's Appx at A4.  In the end, these two documents are not facially inconsistent.

> d)      *FLETC's Determination is not so Implausible that it Could Not Be Ascribed to a Difference in View or Agency Expertise*

Finally, ADS has not shown it to be likely that FLETC's override decision was so implausible that it could not be ascribed to a difference in view or agency expertise.  The D&F asserts that there was an urgent and compelling need to override the CICA stay based on the factors discussed above.  In turn, ADS pokes holes in FLETC's determination by asserting that the purported harm is unsupported, that there were reasonable alternatives to overriding the stay, and that DHS does not have any "overwhelming enforcement needs."  At bottom, much of ADS's grievances can be boiled down to a difference in view over the proper course of action in response to the CICA stay.  In any event, it does not appear at this stage that FLETC's urgent and compelling determination was based on any implausible explanations.

Taken together, ADS has not shown that it is likely to succeed on the merits of its claim that the CICA override was arbitrary and capricious.  Preliminary relief is thus not appropriate.  The court will, in any event, consider the remaining factors.

### B.      Irreparable Harm

When considering irreparable harm, the court looks to whether the movant has "an adequate remedy in the absence of an injunction."  *GEO Grp., Inc. v. United States*, 100 Fed. Cl. 223, 228 (2011) (citing *Magellan Corp. v. United States,* 27 Fed. Cl. 446, 447 (1993)); *see Reilly's Wholesale Produce,* 73 Fed. Cl. at 717.  At this preliminary injunction stage, the focus is on whether [Plaintiff] "will suffer irreparable harm before a decision can be rendered on the merits" of *this* case.  *OAO Corp. v. United States*, 49 Fed. Cl. 478, 480 (2001).  In many cases, the loss of the ability to compete in a lawful competition constitutes irreparable harm.  *E.g.*, *Contracting, Consulting, Eng'g LLC v. United States*, 65 Fed. Cl. 618, 624 (2005).  And in the preliminary posture of this case, ADS must also show "a presently existing, actual threat[.]" *Sheridan Corp. v. United States*, 94 Fed. Cl. 663, 669 (2010).

To establish this presently existing threat, ADS asserts that "[t]his procurement is uniquely susceptible to becoming too-costly-to-comply" because FLETC did not mandate the

---

[12] According to the GAO's docket, its decision in this case is due June 24, 2026.

design of the temporary facilities. Pltf's Mot. 23. Rather, FLETC stated its need for temporary housing, restrooms, laundry, and cafeteria facilities for 500 people per day and allowed the quoters to design their own solutions—i.e., the quoters could choose between several areas on the facility on which to construct the temporary facilities and design the facilities accordingly. *See id.* As a result, the initial site preparation, including underground utilities, etc., are unique to each quote, and may well be incompatible with each other. ADS argues that "Greenlight's site preparation and mobilization will be difficult to reverse and will likely conflict with ADS's unique approach, which will force ADS to undo work it did not plan or quote for." *Id.* at 23-24. Indeed, the D&F explains that Greenlight began the phase-in on March 5, 2026, the day after contract award. Def's Appx at A3. And the D&F confirms that "the phase-in is proceeding at an accelerated timeline" to ensure the facilities are fully operational by May 1, 2026. *Id.* And if there is immediate occupancy, ADS contends that FLETC is likely to determine that it would be too disruptive to remove Greenlight's housing and transition to ADS, meaning that even if ADS's protest to the GAO is successful, it will not have any remedy available. Pltf's Mot. at 24.

It is certainly true that the longer the phase-in (construction) work continues at FLETC Artesia, the more likely ADS will be irreparably harmed—and that harm will accrue while the case is pending before this court. That fact has been obvious since December 31, 2025, when FLETC amended the solicitation, including amending the phase-in period to run from March 1, 2026, through April 30, 2026. Pltf's Mot. at 4 (discussing amendment); *see also id*. Ex. 1, Attach. F, at 1. And the facility is to be operational by May 1, 2026. *Id*. As a result, ADS was well-aware that construction would last no more than 60 days, and each day that passed made its relief potentially harder to obtain.

It makes little sense, therefore, for ADS to have waited as long as it did to file this suit. Recall that ADS filed its GAO protest on March 16, 2026. This was, of course, within the time that Congress set for CICA's automatic stay to apply. 31 U.S.C. § 3553(d)(4). The court does not take issue with that. But ADS got notice of the override decision on March 19, 2026. Pltf's Mot., Ex. 2, Attach. B. Because the solicitation called for the facilities to be fully operational May 1, 2026, ADS knew that it had no more than 43 days after the override notice before construction would be complete. But ADS did not come to court until April 2, 2026, 14 days after receiving notice of the override, or roughly 33% of the phase-in time remaining when ADS got notice of the override. *See* ECF No. 1. That delay is inexplicable. There is nothing in the complaint indicating that ADS needed additional information—in fact, the complaint and initial TRO motion were premised on FLETC's alleged failure to issue a D&F. ECF No. 4-1.

That delay undermines the irreparable harm because "[e]quity aids the vigilant, not those who slumber on their rights." *Elmendorf Support Servs. Joint Venture v. United States*, 105 Fed. Cl. 203, 210 (2012) (citing *LaForge & Budd Const. Co., Inc. v. United States*, 48 Fed. Cl. 566, 570 (2001)). By the time the court held oral argument (the day after ADS filed its supplemental motion and the Government responded), equipment had been delivered, trailers were beginning to be delivered, and Greenlight had completed thirty-five percent of the sitework. Cavanaugh Decl. ¶ 17 (Def's Appx at A7). This included the completion of groundwork for the utility installation and the levelling of the site that Greenlight chose for the dining facility. *Id*.

In the end, ADS has established that it will face irreparable harm because the construction of the temporary facilities will likely be complete before this court can resolve the

merits; it is unlikely that the court can get a record and resolve the case before May 1, 2026, when construction will be complete. That said, the court affords less weight to this harm because had ADS come to court within a few days of the override, the court may well have been able to get a record and resolve the merits by now. Thus, the court concludes that this factor is neutral as to the need for injunctive relief.

### C.       Balance of Harm

When looking to the balance of the harms, the court considers whether the harm to the plaintiff outweighs the harm to the Government and third parties. *Reilly's Wholesale*, 73 Fed. Cl. 705, 715–16 (2006); *see also Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 320 (2009).

Given the nature of preliminary relief in a CICA override protest, the court has detailed much of the harm to the Government above in its discussion of the urgent and compelling need to build housing for new CBP trainees. As explained above, the lack of sufficient housing, restrooms, laundry, and dining facilities to accommodate the projected surge of CBP trainees is reasonably likely to negatively impact or delay their training, which is reasonably likely to lessen CBP's operational readiness and our national security. Of course, this court must "give due regard to the interests of national defense and national security." 28 U.S.C. § 1491(b)(3). And "the fact that a delay in the conduct of this procurement would raise national defense concerns clearly places the weight of the balance-of-harms factor on the defendant's side of the scale." *Aero Corp., S.A. v. United States*, 38 Fed. Cl. 237, 241–42 (1997). This weighs in favor of denying injunctive relief.

### D.       Public Interest

"The public has a strong interest in preserving the integrity of the procurement process." *United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998) (citing *Parcel 49C Ltd. P'ship v. United State*s, 31 F.3d 1147, 1153 (Fed. Cir. 1994)); *see Sheridan Corp. v. United States*, 94 Fed. Cl. 663, 670 (2010). This interest "is compromised whenever an agency abuses its discretion." *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. at 495 (quoting *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003)). ADS claims that there is a public interest in having this bid protest "conclude before moving forward with an award." ECF No. 20-1 at 33.

CICA reflects this strong interest by imposing the automatic stay of performance to allow for the orderly resolution of bid protests at the GAO. But CICA is not absolute, it explicitly provides the Government with the ability to override the stay if there are urgent and compelling circumstances. And in such cases, CICA shows that the public interest is in continued performance. This weighs against injunctive relief.

*        *        *        *        *

Since the court heard oral argument, the Federal Circuit issued a precedential opinion holding that "it is not necessary for a bid protestor to satisfy the four-factor equitable relief test in order to overcome an arbitrary and capricious government override of an automatic CICA stay." *Life Sci. Logistics, LLC v. United States*, No. 2024-1522, 2026 WL 1012500, at *4 (Fed. Cir. Apr. 15, 2026) (slip op). That does not appear to obviate the need for this court to have

addressed the four factors to resolve ADS's motion for a preliminary injunction; it means that ADS could have simply moved for a declaratory judgment and avoided the four factors altogether.

## IV.    Further Proceedings

As the court has suggested, it is unclear what, if any, further proceedings are necessary for this case.  The parties shall confer and file a notice with the court no later than 2:00 p.m. on Friday, April 17, 2026, advising the court of the need for any further proceedings in this case.

## V.    Conclusion

For these reasons, the court denies ADS's motion for preliminary injunctive relief, ECF No. 4, and its supplemental motion for a preliminary injunctive relief, ECF No. 20.

It is so ORDERED.


<u>s/ Edward H. Meyers</u>
Edward H. Meyers
Judge